Keasbey v. Wilkinson.

ANTHONY Q. KEASBEY

51   29
67L 564

*v.*

GEORGE WILKINSON, receiver of the Newark Savings Institution.

1. A creditor, holding the bond of two joint debtors secured by mortgage,. signified to one of those debtors its assent to release him from personal liability· upon the bond, after the sale of the mortgaged premises, in consideration that he would not exact from it compensation for professional services as a lawyer. that he had already rendered it, and that he would continue, without charge, to render it similar services until the happening of a certain future event. At the same time, it expressed a determination not to release the other of the· joint debtors from liability upon the bond.

2. Although the favored debtor knew that the creditor did not intend to· release his joint debtor, and that his release would defeat that intention, he, nevertheless, in sincerity and good faith, interpreted the decision of the creditor to be that he should be released in any event, and thereupon he not only failed to attend the sale of the mortgaged premises, or to take measures· to procure bidders to attend it for the purpose of reducing the deficiency of the proceeds of the sale of the mortgaged premises, but also rendered the· creditor the full service agreed upon, without charge, much of which service· was of such a character that no compensation for it could be enforced. The· service was sought for and accepted by the creditor in full knowledge of the· effect of a release of one of its joint debtors and of the terms upon which the· service was intended to be rendered.—*Held*, that acts of the parties practically determine that the favored debtor correctly interpreted the sense in which· the agreement is to be taken, and also that the creditor's conduct estops it from now claiming a meaning contrary to that which the debtor adopted and' in which the creditor acquiesced, and hence that the debtor is discharged from· liability in virtue of the bond.

Final hearing on bill, answer, replication and proofs.

*Mr. Theodore Runyon,* for the complainant.

*Mr. Cortlandt Parker,* for the defendant.

THE CHANCELLOR. ·

The object of this suit is to perpetually restrain the defendant· from prosecuting a certain bond made and delivered by the com--

plainant and one Alexander T. Compton to the Newark Savings Institution, in order to recover from the complainant an amount claimed to remain due thereon, upon the ground that, so far as the complainant is concerned, the bond must be regarded as wholly satisfied and discharged.

The bond was made in August, 1870, conditioned for the payment of $20,000, and secured by a mortgage upon land belonging to Messrs. Compton and Keasbey, situate on the southerly side of Clinton avenue, in the city of Newark. In 1881 the interest upon the bond had remained unpaid for several years, and liens for unpaid taxes upon the mortgaged lands had been suffered to accumulate. Because of such condition of affairs the savings institution, at that time, commenced to foreclose its mortgage, and at the same time, because of similar unpaid arrears of interest and taxes, commenced the foreclosure of three other mortgages, made by Mr. Keasbey alone, upon lands fronting upon the north side of Clinton avenue. The two foreclosure suits were commenced at about the same time and reached decrees, by default, within a few days of each other.

Prior to that time, in the year 1877, the savings institution had become financially embarrassed to such an extent that it was deemed wise to devise means to prevent the sacrifice of its assets, which would almost of necessity follow an attempt to meet a threatened wholesale demand for payment of deposits with it, and several eminent lawyers, among whom was Mr. Keasbey, were employed to advise it in the emergency. The lawyers agreed that an effort should be made to induce the chancellor to take charge of the institution, in virtue of his general jurisdiction over trusts, and accordingly they made application to him for that purpose. Mr. Keasbey was active and zealous in this application, and not only bore the burden of preparing the papers on which it was based, but also argued before the chancellor for its success. The scheme of the application was approved, and the chancellor assumed to control the institution through the instrumentality of its president and directors, and thereafter Mr. Keasbey continued to act as the bank's counsel in all matters pertaining to that control until the institution's fail-

ure in the year 1884, when the defendant was appointed as its receiver. Prior to the foreclosure suits referred to, Mr. Keasbey had not presented a bill for his services to the bank, having it in mind, he testifies, to secure an offset of the value of those services against his liability for interest on his mortgages.

Mr. Keasbey testifies that after the foreclosure suits had gone to decree by default, and executions had been issued thereon, and sales of the lands were about to be had, he proposed to the president of the savings institution that the institution should buy in the land at a price equal to the amount of the decrees, and that he (Keasbey) would cancel all claim to compensation for the services that he had rendered to it, and that this proposition, after the president had consulted with the funding committee, was accepted with the modification that he should continue to serve the bank in the matter of the chancellor's control, to the end of that control, without charge, to which he agreed, and for that reason that he paid no attention to the sale of the lands but suffered them to be bought by the savings institution without interference in any way, relying upon his agreement that its purchase would be for the full amount of the decrees. The land upon the north side of Clinton avenue, which belonged to Mr. Keasbey alone, was bought in by the bank at the full amount of the decree in that case, but the land upon the southerly side of that avenue, which belonged to Messrs. Compton and Keasbey, was bought in for $15,000, which was a little more than one-half of the decree against the last-named gentlemen.

From the time of the foreclosure sales in October, 1881, to May, 1888, no attempt was made to enforce the payment of the deficiency of proceeds of sale to pay the decree in the suit against Compton and Keasbey, and during that time, till the appointment of the receiver in 1884, Mr. Keasbey continued to render services to the savings institution, as he had proposed, without demanding or exacting payment therefor.

Mr. Keasbey further testifies that after he had made his proposition to the president, and the latter had consulted the funding committee, and had informed Mr. Keasbey of the

Keasbey *v.* Wilkinson.

acceptance of the proposition with the modification stated, that he (Keasbey) suggested to the president that the agreement should be put in some formal shape, and that the president replied that the savings institution would buy the property for the amount of the mortgages and thus settle the matter; that after this assurance, the property upon the northerly side of Clinton avenue, belonging to Mr. Keasbey alone, was first sold and then one of Mr. Keasbey's sons attended the sale and ascertained that the institution had bought the property, according to its agreement, for the full amount of its decree; that when the property on the southerly side was sold no one attended the sale in his behalf because the bank's action at the first sale satisfied him that the agreement would be performed and that he might wholly rely upon it; that after the sale he heard that the property had not been bought according to the agreement, and again urged the president to put the understanding in some formal shape, but was met with the assurance that the arrangement was perfectly well understood, and that there was no necessity for further anxiety about it, the object in purchasing for less than the decree being resorted to merely to save sheriff's fees, and that thereafter he (Keasbey) continued to perform his part of the agreement without charging even his necessary disbursements in behalf of the bank.

By his affidavit, sworn to in March, 1885, and annexed to the bill, Mr. Dodd, in substance, fully corroborates this testimony by Mr. Keasbey. In July, 1891, when called as a witness for the complainant, Mr. Dodd again corroborated the testimony of the complainant, but then, apparently, with some hesitation, uncertainty and confusion of memory; but a month later, when recalled for the defendant, because of a letter he had written to the defendant's solicitor, he testified that, in thinking over the transaction, he recalled pretty clearly that during the progress of the foreclosure Mr. Keasbey called upon him and opened the question as to how liability for deficiencies against him could be avoided, and then suggested that his services should be offset; that he (Dodd) brought the matter to the attention of the funding committee, by whom it was fully considered; that the committee,

Keasbey v. Wilkinson.

without hesitation, consented to the proposed offset, so far as the foreclosure against Keasbey alone was concerned, but hesitated about releasing Compton, and, when informed that the release of Keasbey would effect the release of Compton, one of their number thought there should be some way by which their purpose, that Keasbey should be relieved and Compton held, could be accomplished; that the committee expressed a willingness to release Mr. Keasbey, but at the same time a determination to hold Mr. Compton, and that no formal vote, to the remembrance of the witness, was taken in the matter. The witness added that if Mr. Keasbey was not present at the meeting of the committee at which this conclusion was reached, that he communicated to Mr. Keasbey that the committee was willing to release him but was not willing to release Mr. Compton. He adds that thereafter, acting upon the understanding that Mr. Keasbey was not to be held for the deficiency, no demand of it was made from him, and his continued service to the bank without charge was rendered and accepted.

Mr. Carter, the secretary and treasurer of the bank and secretary of the funding committee, remembers that that committee, after full consideration, agreed to Mr. Keasbey's proposition, and that thereafter the agreement they made was acted upon, as stated by both the savings institution and Mr. Keasbey. The process of reasoning by which the determination to accept Mr. Keasbey's proposition was reached, is exhibited by the production of a sheet of paper, used at the time, which contains a diagram of the mortgaged property upon the southerly side of Clinton avenue, and Mr. Dodd's calculation of its value at the sum of $25,630, a little more than $2,000 less than the amount of the decree, and between $6,000 and $7,000 less than the decree and encumbrances on the land superior to it.

I cannot doubt that there was an understanding between the officers and funding committee of the bank and Mr. Keasbey, to the effect that Keasbey was to be saved harmless from the deficiency, and that the obstacle which prevented the execution of that understanding by the purchase of the land south of Clinton avenue, at the amount of the decree, was the desire to, in

3

some way, hold Mr. Compton liable. The inference is fair that the deficiency was created by a bid, less than the amount of the decree, pending consideration of a plan to effect the purpose of releasing one and holding the other of the joint debtors, and that thus the matter stood when the receiver was appointed. But all the while that it stood, by their actions, both the bank and Mr. Keasbey acquiesced in the understanding that Keasbey was to be released in consideration of his services. No steps were taken to recover a deficiency. Mr. Keasbey's services were accepted for years without any demand being made for his bill, and he never rendered a bill, but, on the contrary, instructed his partners and clerks not to render one, and also, having his agreement in mind, failed to keep a complete account of his services.

There is no record of the action of the funding committee upon their minute-book, and, it is true, the surviving members of that committee fail to remember anything of the transaction. The failure to record the matter may have been due to the disinclination to release Mr. Compton and desire to postpone formal entry in the minutes until a way to avoid such release should appear, and the individual want of memory of this transaction is not remarkable, in view of the fact that it is made to appear by the cross-examination of the several committeemen that they can recall very little, and in many instances nothing, of those matters which are plainly recorded in the minutes as matters which occurred at meetings at which they undoubtedly were present.

By the by-laws of the savings institution, the president was given general control of all the executive business of the bank, subject to the action of the board of managers, and the funding committee was specially empowered to collect obligations due to the institution and sell, dispose of or exchange them. Besides, the minute-books of the board of managers and finance committee, and the testimony, indicate that the regular course of the business of the institution was to submit the settlement of matters partaking of the nature of that which is in question, to the president and funding committee.

The circumstance that no minute was kept of the action of the

funding committee in this matter cannot prejudice the complainant. That committee was required by the by-laws to keep minutes of their proceedings for the information of the board of managers, but its powers were in no wise made dependent upon their performance of that duty.

That the board of managers might lawfully delegate matters of such routine business to a committee is beyond question. *Williams* v. *McKay, 13 Stew. Eq. 189; S. C., 1 Dick. Ch. Rep. 36.*

The greatest difficulty I perceive in the way of the complainant's success in this suit lies in the question which arises if I accept it as fact that the decision of the funding committee was to release him and yet hold Mr. Compton, and that he was cognizant of the determination not to release Compton. Mr. Keasbey denies that anything was said to him about the desire to hold Compton until after the sale of both of the mortgaged properties, and insists that when the sales took place he rested upon the assurance that the agreement, as he understood it, would amply protect him.

The conflict in testimony at this point is not so much one of veracity as it is of memory. When the testimony was given years had elapsed since the transaction, and it may well be that one or other of the witnesses may unconsciously, and with most honest intent, be at fault. For this reason, because the burden of proof is with the complainant, it appears to me to be plain that my duty is to take the case as it may be stated most strongly against him, and assume that he understood before the sale at which there was deficiency, that, while the funding committee was willing to release him, it had determined not to release Mr. Compton. He knew also, then, that this double purpose could not be accomplished. Either he and Compton must both be held or both be released. It is evident, however, that he interpreted the assent to his release as an acceptance of his proposition, which was absolute, even though Compton should not be held, and not only abandoned the mortgaged premises to the savings institution, without attempting to save them or even to reduce the deficiency by procuring competitive bids at the sale, but also proceeded to render to that bank services,

Keasbey v. Wilkinson.

for the most valuable of which, in the absence of special agreement, there can be no recovery (*Hopper* v. *Ludlum, 12 Vroom 182*), and which afforded the consideration he was to give in satisfaction of his debt. For some two years and a half thereafter he and his law partners faithfully did that which the institution required of them, without charge, doing that which must have been known not only to the funding committee but also to the entire board of managers. The proofs show that the president of the bank continually resorted to his office for advice and assistance in the bank's matters as though he were justly entitled to do so. Throughout these years neither did Mr. Keasbey render a bill nor did the bank demand one, and after the appointment of the receiver, when his service, for six and a half years, was ended, and claims against the bank were called for, he did not intimate to the receiver that he was a creditor of the insolvent institution. That he was sincere in his belief that his release was absolutely agreed upon, appears not only by his testimony, but also by his consistent conduct, and conspicuously by the fact that his record or accounts of his services are incompletely kept. Attributing to him business-like foresight, it is apparent that disbelief or even doubt upon his part would naturally have led him to minutely note every service and disbursement, that he might, in proper time, be in position to claim full compensation and repayment.

I am satisfied that during the rendition of the services after the foreclosure sales in 1881, the officers and funding committee of the bank, whose *personnel* did not change, knew that Mr. Keasbey was acting upon the faith that they had assented to the satisfaction of his debt in consideration of those services, and I cannot escape the conclusion that their acceptance of the services, under such circumstances, was such an acquiescence in that understanding of the meaning of their assent as not only to be strong presumptive evidence that their understanding of it was the same (*Renwick* v. *Wheeler, 48 Fed. Rep. 431 ; Burnet* v. *Denniston, 5 Johns. Ch. 35 ; Burlew* v. *Hillman, 1 C. E. Gr. 23*), but also to estop the institution or its receiver from now asserting a contrary meaning. *Sumner* v. *Seaton, 2 Dick. Ch. Rep.*

*103 ; Ruckelschaus v. Oehme, 3 Dick. Ch. Rep. 436 ; S. C., affirmed on appeal, 4 Dick. Ch. Rep. 340.*

The conduct of the parties, after the transaction, practically determined the sense in which the assent was to be taken—a sense which equity now forbids either to gainsay. If a contrary meaning was relied upon by the institution, it should have been promptly asserted. The silent acceptance of continuous services, payment of compensation for which could not be enforced, for two and a half years, worked Mr. Keasbey substantial injury, and thereby has at least raised an equity in his favor, which must estop the bank or its receiver from now asserting that which will enable it to recover the deficiency.

Whether, then, I hold that the conduct of the parties proves their mutual understanding of the agreement as one to be performed in absolute satisfaction of the deficiency, or that it merely exhibits silent acquiescence in an honest but mistaken construction of the bank's assent, on the part of Mr. Keasbey, to his substantial injury, which creates an estoppel in his favor, my conclusion upon the whole case must be the same.

It is unnecessary to consider whether the services rendered in exchange for the satisfaction of the decree were adequate. That question is immaterial here. The consideration they afforded was valuable and was acceptable to the agents of the bank, who, acting in good faith and being free from all imposition and fraud, were the sole judges of its sufficiency. *Traphagen v. Voorhees, 17 Stew. Eq. 21, 31.*

I will perpetually enjoin the receiver from prosecuting his suit against the complainant.