The bill of complaint in this case was filed by the complainant for the purpose of restraining the enforcement of the payment of a bond and mortgage in the principal sum of $150,000 given by one Fred M. Barnet to Tillie O. Barnett and assigned by the said Tillie O. Barnett to the defendant Valco Mortgage Company. After the said mortgage was given, Fred M. Barnet conveyed the premises covered by the said mortgage to the complainant, 536 Broad Street Corporation, subject to the said mortgage.
The bill of complaint alleges that the defendant John Warren was the treasurer, attorney and manager of the complainant and also owned or controlled the defendant Valco Mortgage Company. It is charged that the said Warren secretly and surreptitiously and without the knowledge of complainant purchased the said mortgage for $55,000 and caused it to be assigned to the Valco Mortgage Company for his or his wife's benefit and to the detriment of complainant and now is endeavoring to enforce the payment of the whole principal amount of the mortgage and interest by complainant.
The evidence disclosed that the property covered by the mortgage in question consisted of a lot in the City of Newark on which was erected an automobile showroom and garage. *Page 363 
The property was acquired by Fred M. Barnet as a result of a settlement of litigation over the will of James G. Barnett, an uncle of Fred M. Barnet and the husband of Tillie O. Barnett. The settlement resulted in the conveyance of the property to Fred M. Barnet and the said mortgage covering said premises to Tillie O. Barnett, the widow of James G. Barnett. At the time of the said settlement Fred M. Barnet had no cash with which to pay his lawyers and, therefore, by agreement formed the complainant company, 536 Broad Street Corporation, and distributed the shares of stock of said company as follows: Fred M. Barnet, 2,333; John Warren, 739; Percy Britt, 185; Thomas J. Stanton, 185, and Edward Maxon, 58.
The law firm of Warren, Britt and Stanton represented Fred M. Barnet in the litigation and settlement and Edward Maxon was associated with them. The stock was distributed in May, 1927. Fred M. Barnet was elected president; Stanton, vice-president and secretary, and Warren, treasurer. The management remained unchanged until 1933 or 1934. Between 1927 and 1930 the company had no income for the reason that it was in litigation with the tenant, which was a Cadillac agency, over possession and rents. The company, therefore, was financed by borrowing on its notes endorsed by Barnet and, in some instances, also by Warren. A settlement of the litigation with the tenant was made early in 1931. As a result of the settlement the company was benefited by the payment of a substantial amount of cash and an adjustment of taxes with the tenant.
At the time of the hearing of this case, Tillie O. Barnett, Fred M. Barnet and Rachael Barnet, his wife, were dead.
On January 21st, 1933, Warren filed a report in writing at a meeting of the directors of the corporation. The report stated that consideration should be given to the fact that the lease on the building expired the next November and that the mortgage of Tillie O. Barnett would fall due on May 1st, 1934. He suggested that the corporation should endeavor to purchase the mortgage at a substantial discount; and at the same time, stated that he had talked to her about it and that she would not accept less than the principal amount due. *Page 364 
He also said that it was absolutely essential that the company keep on hand liquid assets to care for carrying charges over a period of two or three years in case the property was not rented.
The premises were vacated by the tenant on October 31st, 1933. Warren testified that, during 1933 and the early part of 1934, he endeavored to obtain an extension of the mortgage, without success, and that Tillie O. Barnett would accept nothing except full payment of the mortgage.
Warren was declared a bankrupt in 1933 and was discharged as such in the fall of that year.
On or about November 4th, 1933, Warren says he told Fred M. Barnet that he would have to arrange other management as he was going to quit as treasurer of the company; that he had lost his stock and had no other interest in the company. However, on the same day he wrote Tillie O. Barnett asking her to reconsider her refusal to extend the mortgage. Warren had testified that Tillie O. Barnett did not like Fred M. Barnet and himself on account of the litigation over her husband's will. He said Tillie O. Barnett came to his office, in response to the above mentioned letter, demanded full payment of the mortgage and evidenced "bitter feeling against Fred and myself." Although Warren had told Barnet he had no incentive to serve the company, he wrote Barnet on January 2d 1934, that he had not paid the January 1st interest and saw no reason for postponing the time when Mrs. Barnett would be forced to make up her mind definitely as to what she would do with reference to the mortgage; and, that if there was to be a foreclosure it might just as well come then as in May. On January 5th he again wrote Fred M. Barnet concerning the 1933 and 1934 assessments and again referred to the non-payment of the January 1st interest stating it was the "best way to bring her to time."
On January 10th, 1934, the stockholders of Broad Street Corporation held an annual meeting. A list of the stockholders appended to the minutes of that meeting shows among the stockholders that John Warren held 454 shares. However, only 2,001 shares were voted; 2,000 by Mr. Barnet and 1 by Thomas J. Stanton. The directors elected were Fred *Page 365 
M. Barnet, Rachael Barnet and Thomas J. Stanton. Warren was present and submitted his financial report for the year ending December 31st, 1933. The statement showed that the liquid assets of the corporation consisted of $44,000 cash, $15,000 in income building and loan shares, and stocks of the value of $6,500. The building was carried at $455,000. Warren further reported that the tenant vacated the premises on October 31st, 1933, and that a new lease could not be made for the reason that Tillie O. Barnett would not extend the mortgage which matured May 1st, 1934. Warren said there was some discussion about the attitude taken by Tillie O. Barnett relative to her mortgage. He also testified that at this meeting, Fred M. Barnet offered to transfer stock to him in order that he might become a stockholder and officer. This offer, he said, he rejected because "we all anticipated that the property would be lost" and the company wiped out by the foreclosure. On the same day the newly elected directors met and discussed the mortgage situation and adopted a resolution that no taxes or interest on the mortgage be paid "until some agreement is made for the extension of the said mortgage." Mr. Stanton was designated counsel. This appears to be the first time that the directors designated counsel for the company although Warren had been acting as such since its organization.
Warren claims that William C. Fiedler, a real estate broker, called on him in the early part of February, 1934, and told him that he was authorized to sell the Tillie O. Barnett mortgage at a substantial discount. He said that Fiedler also stated that he was not to offer the mortgage to the Broad Street Corporation, Fred M. Barnet or John Warren. Warren said Fiedler told him that the mortgage could be purchased for $50,000 by the payment of $30,000 in cash, $25,000 on a note for one year and that he Fiedler would charge a commission of $5,000.
Mr. Fiedler testified that he was a witness for Tillie O. Barnett in the will litigation. He said he was asked to come to the law office of Pitney, Hardin Skinner and there talked to Mr. Carl Feick, who represented Mrs. Barnett. After that conversation he attempted to sell the mortgage by offering *Page 366 
it to several parties without result. He further said that he was not permitted to offer it to the mortgage companies. He then testified as follows: "It was suggested to me by Mr. Feick, that, because of the family feud, that I do not bother anybody that owned the property or anybody connected with it, and I did not until I found that I could not sell this mortgage. Then I asked Mr. Feick, who represented Mrs. Barnett — I said: `You are trying to get some money for this lady. What difference does it make whom I sell it to?' I said, `Let us not be foolish about this thing.'" Fiedler said that Mr. Feick told him that Mrs. Barnett was willing to sell the mortgage for $30,000 but he told her not to sell for that amount. "He told me that the mortgage should bring $50,000. I then said to Mr. Feick, `Why can't I see John Warren? He is the man I have dealt with in the transactions.'" Fiedler said Mr. Feick replied, "`I don't see where there should be any objection.' I said, `Suppose I see John Warren. I have known him so long.'" Mr. Fiedler further testified: "I saw Mr. Warren. I said, `I have no authority to offer it to you, but I wish you would come with me to see Mr. Feick and see whether we cannot do something.' So we made an appointment with Mr. Feick and Mr. Warren then succeeded in selling that mortgage. That is all the interest I had in it."
Mr. Fiedler testified in answer to a further question as to his first conversation with Warren about the sale of the mortgage, that, "I told him plainly the disposition of Mrs. Barnett was not to do business with the people with whom she had had legal troubles, but that I thought they were the logical purchasers of this mortgage; they had an interest in the ownership — and if I could get Mr. Feick to go along with it, my job was done."
It is apparent from the above testimony that Mr. Feick consented to deal with Mr. Warren in the sale of the mortgage and knew of Warren's interest in the purchaser, Valco. It is, therefore, clear that the formation of Valco was not intended to deceive Tillie O. Barnett. If this were not the fact, why was Mr. Feick not called as a witness by the defendant to explain the situation? *Page 367 
Warren testified that he told Barnet about the offer and that a company could be organized to take over the mortgage. Warren said that Barnet thought the company should not invest its funds in the purchase of the mortgage as he did not know what would happen to the property which was without a tenant. Warren further testified that he asked Barnet whether it would be satisfactory to him if he raised the money and purchased the mortgage and that Barnet said he would be "glad to have the mortgage in my control." Warren said he was unable to interest anyone in the purchase of the mortgage but organized a corporation known as the "Valco Mortgage Company" for the purpose of purchasing the mortgage.
Warren said Francis P. Meehan, a Newark lawyer, organized the company for him on February 14th, 1934. The incorporators named in the certificate were Francis P. Meehan, eight shares; Lawrence S. Hickey, one share; Sanford M. Kirsch, one share. Mr. Hickey and Mr. Kirsch were associated with Mr. Meehan. Mr. Meehan was designated the statutory agent and his office was the principal office of the company. He and the other incorporators were elected directors. Mr. Meehan was elected president; Mr. Hickey, vice-president, and Mr. Kirsch, secretary.
The Valco Company began business without funds. A resolution was adopted on the day of the organization to purchase the Tillie O. Barnett mortgage for $55,000, and on February 27th, 1934, Tillie O. Barnett assigned the mortgage to the Valco Mortgage Company.
Warren met one Samuel Greenberg, through the National State Bank of Newark, who was said to be a wealthy man who loaned money for large profits. Greenberg arranged to loan Valco $30,000 to pay Tillie O. Barnett and take the Valco Mortgage Company's note for that amount payable in thirty days at six per centum and also to take an assignment of all of the Valco Mortgage Company's stock, which stock, Warren could buy back at a fixed price. Warren said that he did not remember the amount which he was to pay Greenberg for the return of the stock but said "it was a lot of money * * * thousands of dollars." Greenberg agreed *Page 368 
orally not to pay the $25,000 note which the Valco Mortgage Company was to give to Tillie O. Barnett for the balance of the purchase price before its maturity which would occur in February, 1935. No part of the agreement was in writing.
Warren said that he told Barnet about the transaction and that Barnet said he was glad that Warren had the option as it would give Warren thirty days within which to work out a plan to control the mortgage for himself.
On February 27th, 1934, Hickey resigned as a director of the Valco Mortgage Company and Miss Montello, Mr. Meehan's secretary, qualified in his place.
The purchase of the mortgage was ratified by the directors of the Valco Company. An assignment of the mortgage from Tillie O. Barnett to the Valco Company, stating that the consideration was $55,000, was received and reassigned to Tillie O. Barnett as collateral security for the payment of the note of $25,000 given by Valco Mortgage Company to Tillie O. Barnett. Another assignment was made by Tillie O. Barnett to the Valco Mortgage Company reassigning the above mortgage to that company which assignment was accompanied by an escrow agreement and the original bond and mortgage. This last assignment, together with the bond and mortgage and escrow agreement, were held by the National State Bank of Newark to be delivered to the Valco Mortgage Company when the note was paid in full and, if not paid, then to be delivered to Tillie O. Barnett.
In this transaction, Greenberg purchased two cashier's checks totaling $30,000, payable to Tillie O. Barnett, and which were delivered to Feick, and Greenberg received the promissory note of the Valco Mortgage Company for $30,000, payable March 27th, 1934. The ten shares of the Valco Company stock were endorsed in blank and turned over to Greenberg.
Warren testified that after these transactions took place, he told Barnet the details of the same. Warren said that he had given up hope of raising the necessary funds to carry out the transaction and so informed Barnet. He said that Barnet stated "he did not want any * * * Jew holding a club over his head," and that Broad would pay the Greenberg *Page 369 
loan if he, Warren, would again work for the Broad Street Corporation and take charge of its affairs without compensation other than the profit which he might make on the Tillie O. Barnett mortgage.
Warren said he told Barnet again about the difficulty of crediting the payment on account of the mortgage because of the escrow agreement and Barnet told him to see Mr. Stanton and work out the details. Warren testified that at the time of this conversation he always had "a confidence in the future" of the Broad Street property.
Warren said he then saw Greenberg and Greenberg agreed that if the $30,000 was repaid to him he would give Warren an opportunity to repurchase the Valco Mortgage stock by installment payments. Warren testified that he conferred with Mr. Stanton and that they prepared a draft of a contract between the Broad Street Corporation and the Valco Company and, as a result, on March 19th, 1934, the directors of the Broad Street Corporation, consisting of Fred M. Barnet, and his wife, and Stanton, met with Warren at his office.
At that meeting the Broad Street Corporation agreed to pay $35,000 if the Valco Company would extend the time of the payment of the mortgage to February 15th, 1935, and also to pay $1,750 on account of interest which was due on January 1st, 1934. The agreement was then prepared and executed by Broad Street Corporation and by Mr. Meehan, the president of Valco Company, on its behalf. The Valco Company received a check of the Broad Street Corporation for the sum of $36,750 which check was endorsed by Francis P. Meehan, president. It was agreed that this payment was not to be credited on account of principal until February 15th, 1935, for the reason that Valco Company did not, as yet, have full control of the mortgage. Judge Stanton testified that about a week before the above mentioned meeting of the directors of the Broad Street Corporation, Warren told him that the mortgage had been called by a concern which recently purchased it and that the name of the concern was the Valco Mortgage Company which was represented by Francis P. Meehan. Judge Stanton further testified that he never knew that the Tillie O. Barnett mortgage could be *Page 370 
acquired for $50,000 and that Warren never mentioned Greenberg to him or that he, Warren, was interested in the Valco Company. In fact, Stanton said, that he never heard of Greenberg or the acquisition of the mortgage for $55,000 by the Valco Company until after the present suit had been instituted.
Warren says the testimony of Judge Stanton is not true and that all the details of the transaction, including the formation of the Valco Mortgage Company, the purchase of the mortgage, the deal with Greenberg, and all the other details were fully discussed and understood by those who were present at the meeting. A promise relative to the cancellation of the bond is contained in a letter dated March 19th, 1934, a copy of which follows:
"March 19, 1934. Fred M. Barnet, Esq., Fairmount Avenue, Chatham, N.J.
Dear Sir:
Upon reduction of the bond and mortgage encumbering 536 Broad Street, Newark, N.J., to the sum of $100,000.00. the undersigned will give to you a covenant not to sue, in the event that any deficiency may later arise in connection with the said bond and mortgage.
 Yours very truly, VALCO MORTGAGE COMPANY, INC. By Francis P. Meehan, President."
Warren said that after Greenberg was out there were never any agreements in writing between the Valco Company and the Broad Street Corporation but that everything was carried out according to the agreement which was made between Warren and Fred M. Barnet concerning the Valco Company and the Broad Street Corporation. He further testified that while Mr. Barnet never received a release from Valco, in accordance with an alleged agreement, that when Valco obtained control of the mortgage he immediately destroyed the bond in accordance with said agreement of March 19th, 1934. As a matter of fact, the bond remained in the hands of the Valco Company and was produced by Mr. Warren at the time of the hearing with a part of the seal and name torn but not entirely removed from the instrument. *Page 371 
While the Broad Street Corporation, through Valco, paid Greenberg in March, 1934, Warren did not obtain possession of the Valco stock until August, 1934, according to his statement. After March 19th, 1934, Warren says he again attended to all the affairs of the Broad Street Corporation and continued to do so to the present time.
Between March 28th, 1934, and January 18th, 1935, the Broad Street Corporation paid the Valco Mortgage Company a total of $10,000 on account of principal and $7,211.48 interest. At the time of these payments no question was raised as to the ability of Valco to credit it on account of the mortgage as was the case with the $35,000 payment made on March 19th, 1934.
Warren had repurchased, for a nominal consideration, about 400 shares of stock of the Broad Street Corporation which he owned prior to his bankruptcy. Warren testified that in the early part of 1935 he attempted to raise money to pay the note of Tillie O. Barnett. In the month of September, 1935, Warren negotiated a loan of $40,000 with the National State Bank of Newark. The loan was obtained in the following manner: Warren was president of Gibraltar Bonds, Inc., which held certain shares of stock of the Broad Street Corporation (although no such ownership appears in the stock book or ledger of that corporation). Gibraltar Bonds then delivered to Valco certain municipal bonds of the par value of $15,000 and took, as collateral security, an interest to the extent of $15,000 in the bond and mortgage of Tillie O. Barnett. The bank, however, required additional collateral. As a result, a special meeting of the directors of the Broad Street Corporation was held on February 26th, 1935, at which Fred and Rachael Barnet, his wife, and Warren were present. At this meeting a resolution was adopted whereby the Broad Street Corporation guaranteed the payment to the bank of the note to be given by Valco Mortgage Company for the sum of $40,000 and pledged as collateral security 100 shares of National Dairy Products, 50 shares of Public Service Corporation, 20 shares of Detroit Edison, 50 shares of West End Building and Loan Association and 50 shares of Eleventh Ward Building and Loan Association. *Page 372 
The resolution further directed that the president and treasurer deliver the securities to Valco Mortgage Company and, further provided, that the president and treasurer of the Broad Street Corporation execute and deliver to Gibraltar Bonds an estoppel certificate certifying there was due on the Tillie O. Barnett mortgage the sum of $105,000 with interest from January 1st, 1935, and another estoppel certificate to the National State Bank of Newark stating the same amount was due. The note of the Valco Company for $40,000 was dated February 27th, 1935, and signed by Francis P. Meehan, as president. The note was also endorsed by John Warren and Fred M. Barnet, individually. The estoppel certificates and the collateral were delivered in accordance with the resolution.
On February 28th, 1935, Warren wrote Barnet stating that the matter had been closed and again said he would endeavor to refinance the property as this was only "a temporary expedient which has averted foreclosure," but made no mention of the fact that he had any interest in Valco Mortgage Company.
On March 2d 1935, a special meeting of the board of directors of the Valco Mortgage Company was held in which Meehan, Kirsch and Montello resigned as directors. The stock book of that company shows that new shares were issued on March 4th, as follows: Marie B. Warren, eight shares; Rose Bellinkoff, one share, and B.A. Garrigan, one share. (Rose Bellinkoff was Warren's secretary and B.A. Garrigan was a lawyer associated with Warren.) Thereupon, Mrs. Warren became president and Mr. Warren, treasurer, although no record of the election appears in the minute book.
On March 6th, 1935, Warren wrote Fred M. Barnet a letter wherein he stated:
"The Valco has now elected Mrs. Warren as president, Miss Bell as Secretary, and myself as treasurer, and Mrs. Warren, Miss Bell, and Mr. Garrigan as directors. I wanted to tell you about this last night, as it is an assurance to you that, so long as the Valco can hang on to the mortgage, you need not fear foreclosure."
Until the Belfattos became interested this is the first and only letter or writing in which Warren's connection with *Page 373 
Valco appears. Barnet's reaction to this letter is not evidenced by anything in writing.
On July 30th, 1936, the Guardian Life Insurance Company, which Warren represented in this state, agreed to take a first mortgage of $50,000 on the Broad Street Corporation property. The loan was closed on September 11th, 1936, by a bond and mortgage for $50,000 to the Guardian Life Insurance Company. In addition to this, Barnet and Warren gave a bond to the Life Insurance Company; Broad Street assigned its leases; Valco subordinated its mortgage, and Mr. and Mrs. Warren assigned rights under two life insurance policies. Barnet made and delivered an affidavit setting forth that there was due, on the mortgage held by Valco, the sum of $105,000.
After the $50,000 loan, the directors of Broad Street met and received an itemized statement from Warren of the proceeds of the mortgage and the disbursements made by him, a copy of which was offered in evidence. This included taxes, counsel fees, payment of the municipal bonds purchased from Gibraltar, balance of the note and interest due the National State Bank, and a payment of $11,500 to Valco Mortgage Company, the total of which payments amounted to $49,874.95. Of this total, $32,064.88 was paid either directly to Valco or for its benefit.
Warren testified that the payment to Gibraltar was necessary because the bank had sold the municipal bonds and that Valco had to pay Gibraltar to obtain a reassignment of the $15,000 interest in the Tillie O. Barnett mortgage in order to enable Valco to subordinate its mortgage to that of the Guardian Life Insurance Company.
The ledger of the Broad Street Corporation disclosed that it paid, on account of the principal of the Tillie O. Barnett mortgage, the sum of $78,123.70 and the sum of $25,890.41 on account of interest, making a total of $104,014.11. Warren claims the amount paid by Broad to Valco or to others for the benefit of Valco amounted to $89,152.08. The bill of complaint alleges that the defendant collected $111,000. I have been unable to reconcile the differences.
After the Guardian Life Loan was closed, Broad Street *Page 374 
Corporation collected the rent until March, 1938, at which time the Valco Company collected the rent and remitted it to Guardian Life Insurance Company. In April, 1938, and continuing to the present time, the Guardian Life Insurance Company has collected the rents and applied them on the loan.
Fred M. Barnet became ill and was taken to the hospital about August, 1938. Mrs. Barnet informed Warren of this fact and told him she needed money. Warren said she also told him that Fred was too sick to see him.
On September 29th, 1938, Warren received a letter from G.M. Belfatto, a New Jersey lawyer, advising Warren that he, Belfatto, represented Mrs. Rachael Barnet. A few days after the receipt of the letter, Warren said that Mr. Belfatto, and his son, called at his office and talked over the affairs of the Broad Street Corporation. On that occasion Warren said that Mrs. Warren would take $50,000 for the interest in the mortgage which Valco held and the stock which she held in the Broad Street Corporation. Mr. Belfatto said he would consider the matter.
After the conference some correspondence took place between Belfatto and Warren relative to the affairs of the Broad Street Corporation. A meeting was held of the stockholders of the Broad Street Corporation at Warren's office on February 14th, 1939, at which Mr. Charles B. Collins, a member of the bar, who at that time represented the Belfattos, was present together with Vincent Belfatto and John Warren. Mr. Collins held a proxy from Rachael Barnet for 333 shares, and Vincent Belfatto held a proxy from Fred M. Barnet for 2,000 shares. At the meeting Warren voted 354 shares standing in his name. Collins, Vincent Belfatto and Warren were elected directors. Vincent Belfatto became president; Rachael Barnet, vice-president; Collins, treasurer, and Warren, secretary. Collins testified that on January 20th, Warren informed him that "Valco is now a holding corporation" for Mrs. Warren.
Several other conferences were held and on June 13th, 1939, Collins withdrew as attorney, director and stockholder. No reason appears from the evidence as to why he withdrew. *Page 375 
On July 1st, 1939, Belfatto wrote Warren on behalf of Mr. and Mrs. Barnet stating that he intended to file a bill in the Court of Chancery and demanded cancellation of the mortgage held by the Valco Mortgage Company. On July 11th, 1939, Warren wrote Belfatto stating that the transaction had been approved by Fred M. Barnet and stating that he would hold Mr. and Mrs. Barnet responsible for all damages because the mortgage could not be used by Valco by reason of the threat to have it declared void. Warren made no mention in this letter of the alleged agreement between himself and Barnet relative to the management of Broad Street Corporation and in consideration of which Broad was to pay Greenberg and also enable Warren to pay something on account of the purchase price of the Valco Mortgage stock and that Warren would be compensated for his services rendered to Broad by the payments which Broad would make upon the mortgage.
Mr. Warren's former secretary, Rose Bellinkoff, known as Bell, attempted to corroborate his story that Barnet was anxious to have Warren acquire the mortgage and knew that Warren controlled the Valco Mortgage Company. While she said that Mr. Barnet displayed a keen interest in the details of Broad Corporation she also said that in general he relied on Warren to manage Broad's affairs. On her direct examination she testified that she "had drawn up" an option permitting Warren to repurchase the Valco stock and that she had "typed it" although she afterward stated that she was not certain that she ever saw or typed it. Warren had testified that the option was oral. Miss Bellinkoff's testimony is not convincing.
It is unbelievable that Fred M. Barnet was so stupid as to refuse to purchase the Tillie O. Barnett mortgage for $55,000 and thereby cancel Broad's debt of $150,000 and thousands of dollars of interest. Even the defendants admitted that Barnet was a shrewd business man. The Broad Corporation was his only source of income and his principal asset. Instead of rehabilitating the financial position of Broad Corporation, its affairs were being put more and more in jeopardy as is evidenced by the payments of over $100,000 at the present time. *Page 376 
All threats to foreclose came from Warren. There is nothing in writing from Tillie O. Barnett, or from anyone representing her, relative to any foreclosure. Contrary to Warren's testimony to the effect that Barnet had full knowledge of Warren's connection with Valco, the available documentary evidence leads me to the conclusion that Broad Street believed it was dealing at arm's length in its negotiations with Valco. All the minutes of Broad Street and the correspondence emphasize this fact. The formalities which were observed in those dealings are not consistent with the claim of full knowledge which is now advanced by the defendants. For instance, on March 16th, 1934, over two weeks after Valco had acquired the mortgage, Warren wrote Barnet as follows:
"I have already taken up the matter of arranging the terms of the extension of the mortgage on Broad Street and am certain that the matter will be settled tomorrow."
The letter of March 6th, 1935, hereinbefore quoted, which apprised Mr. Barnet of Warren's connections with Valco came over a year after Valco acquired the mortgage.
Warren argues that the relationship of attorney and client, between himself and the Broad Street Corporation, ceased to exist on January 10th, 1934. However, on January 2d 1934, he wrote Barnet a letter concerning the mortgage and on January 5th, 1934, another letter concerning the mortgage and a tax appeal; on January 25th, 1934, a letter concerning a prospective rental and the 1934 assessment; on January 31st, 1934, about a prospective tenant and the mortgage; on February 6th, 1934, about Broad Street's income tax; and on March 16th, 1934, the above mentioned letter to Fred M. Barnet. The letter of March 16th, 1934, as above stated, was written more than two weeks after Valco purchased the mortgage and three days before the payment of $35,000 was made on account of the mortgage, which money was used to pay Greenberg. Warren continued to inform Barnet that he was "arranging the terms of the extension of the mortgage." The arrangement, mentioned in the above letter, certainly could not have been with Tillie O. Barnett as she had already assigned her mortgage to the Valco Company. *Page 377 
In addition to the above, the answer of the defendant sets forth that in February, 1934, Warren was engaged by Barnet to obtain an extension of the mortgage then owned by Tillie O. Barnett and that he, Warren, was successful in arranging that extension. The defendant is bound by that pleading. Hageman v.Brown, 76 N.J. Eq. 126.
Defendant contends that the burden of establishing the fiduciary relations between Warren and the Broad Street Corporation is upon complainant and cites the cases of Jaeger
v. Hannan, 90 N.J. Eq. 396; affirmed, 92 N.J. Eq. 257; In reFulper's Estate, 99 N.J. Eq. 293, and DuBois v. CenturyCement Products Co., 119 N.J. Eq. 472. The cases cited are not applicable in this proceeding. None of them deal with the relation of attorney and client.
The defendant was the attorney of the complainant and the law holds him to a much higher degree of responsibility than is required of other fiduciaries. See Raimondi v. Bianchi,100 N.J. Eq. 238 (reversed on other grounds, 102 N.J. Eq. 254). See, also, Condit v. Blackwell, 22 N.J. Eq. 481, in which it is said:
"* * * the burden of establishing the perfect fairness, adequacy, and equity of the negotiation is thrown upon the attorney, and in the absence of such proof, courts of equity treat the case as one of constructive fraud. 1 Story Eq., §311."
The rule as stated in 7 C.J.S., Attorney and Client, §§ 125,132, is that:
"Once the relationship has been created, however, the duty of fairness, good faith, and fidelity is a continuing one which may extend beyond the continuance of the relationship itself, so long as the influence arising from the relationship exists or there is a possibility of the attorney using confidential knowledge or information at the expense of the client."
See, also, 3 Pom. Eq. Jur. 836 § 960c.
The latest reported case in New Jersey relative to the question is Schenck v. Davis, 134 N.J. Eq. 375. In the Davis Case
all the parties to the transaction were living at the time of the hearing. Davis offered to sell the judgment, which he *Page 378 
held, for a small sum to his client and advised his client that he must protect his own interest at the sale after the client refused to purchase the same. The Court of Errors and Appeals, in that case, reiterates the above rule in the following words:
"The relationship of attorney and client, being one of great confidence, is necessarily subject to the closest scrutiny where it might appear that the attorney had taken advantage of the client."
Continuing, the court said:
"A notice to a client that his lawyer no longer represents him should be timely, clear and unmistakable. There was no such notice here. No writing was sent to the client by the attorney terminating the relationship. The oral notification claimed was neither clear nor unequivocal."
The court also said in the Davis Case, that where an attorney has a financial interest adverse to that of his client, the court leans "most strongly" against the attorney, citing the cases ofPerkins v. Deal Beach Realty Co., 92 N.J. Eq. 526; Dwyer v.Anderson, 113 N.J. Eq. 210; Raimondi v. Bianchi, 100 N.J. Eq. 238; In re Romaine's Will, 113 N.J. Eq. 477; affirmed, 115 N.J. Eq. 173.
With like import are the cases of McArthur v. Goodwin,173 Cal. 499; 160 Pac. Rep. 679; Cline v. Charles, 124 S.W. 347.
See, also, the case of Ex parte James, 8 Ves. Jun. 337; 32Reprint 385. In the James Case, a bankrupt's estate was bid in at public auction by the solicitor and while the bidding was competitive and the price was fair, the court set the sale aside. The solicitor requested to be permitted to give up his office of solicitor and make a bid at the resale but the court refused the request and said:
"If the principle is right, that the solicitor cannot buy it, it would lead to all the mischief of acting up to the point of the sale, getting all the information that may be useful to him, then discharging himself from the character of solicitor and buying the property. Infinite mischief would be the consequence * * *."
In McArthur v. Goodwin, supra, an attorney for the owner of land encumbered by a mortgage, purchased the note and *Page 379 
mortgage through intermediaries, without informing the owner of that fact. It was alleged that he had operated through the dummies in order to conceal the facts from his client and with the fraudulent purpose of compelling his client to pay on account of the note and mortgage, a much larger sum than he, the attorney, had paid to satisfy and discharge it. It was there held that the purchase was void.
In Cline v. Charles, supra, the court pointed out that where an attorney's conduct is thus called into question, it has been said that the courts should refrain from drawing a nice line as to just when the relation of attorney and client ceases.
Warren claims that complainant is estopped from asking the cancellation of the mortgage because of the services which he rendered to protect the complainant for a period of ten years without compensation pursuant to his alleged agreement with Fred M. Barnet. I am satisfied that there was no such contract, not only because of the improbability of its alleged provisions, but also because its existence cannot be inferred from any of the many writings which are in evidence. Any efforts which Warren put forth in the interest of Broad also benefited him as a stockholder, or his wife, or Valco, which he owned or controlled. The complainant would not be estopped because of acquiescence on the part of Broad because Broad never knew of Warren's identity with Valco. There was no estoppel after the Belfattos appeared, as I am satisfied from the evidence, that they had not sufficient information relative to Warren's conduct with respect to his acquisition of the mortgage which would put them on notice. Broad made no payments in recognition of the mortgage after March 17th, 1938, and Valco never attempted to foreclose it. In the year 1938 Fred M. Barnet was taken to the hospital and Mrs. Barnet retained the Belfattos to represent their interest, as above stated.
Defendant relies on the cases of Keasbey v. Wilkinson,51 N.J. Eq. 29, and Solimine v. Hollander, 128 N.J. Eq. 228,276. In the Keasbey Case there was an oral contract between Keasbey and a bank whereby Keasbey was to be released of his obligation on a bond for legal services to be rendered by him to the bank without compensation. The said contract *Page 380 
was admitted by both parties and the court held the receiver of the insolvent bank was estopped from enforcing the obligation against Keasbey. In the present case the contract is denied by complainant and there is no documentary evidence of its existence. The only proof of its existence comes from the mouth of Mr. Warren, to the effect that he made the contract with Mr. Barnet. In the Solimine Case the evidence disclosed that all of the stockholders knew of the Canadian option and acquiesced therein. Such was not the fact in the pending case.
Acquiescence, such as will raise an estoppel, presupposes full knowledge, or, in the alternative, circumstances which may fairly be said to put one on notice. The proofs here fail to establish that Broad had notice, actual or constructive.
Defendants also claim that they were prejudiced in the delay of bringing this suit for the reason that some of Warren's personal records were lost. Collins did not testify that he saw any records of Valco and Warren's testimony is that the only record book of Valco was its check book which, he says, is lost. The bill of complaint was filed on March 4th, 1942, and the delay was not caused by the complainant as the Belfattos had difficulty in finding a solicitor to represent them. I, therefore, am of the opinion that the complainant was not in laches. See Turnley v.Nixon, 112 N.J. Eq. 116 (at pp. 124, 125).
The defendants also claim that because the assignment from Tillie O. Barnett to Valco was recorded and the purchase price stated therein, Broad had constructive notice of the amount paid. I think this is not so because Broad relied on the information given to it by Warren both by letters and resolutions and reports prepared by him for Broad. Barnet, as president of Broad, had no reason to question Warren's representations.
Defendants also rely on the cases of Todd v. Exeter LandCo., 103 N.J. Eq. 268; Gaston v. American Exchange NationalBank, 29 N.J. Eq. 98; Trenton Banking Co. v. Woodruff, 2 N.J. Eq. 117,
and Blake v. Domestic Manufacturing Co., 64 N.J. Eq. 480,
whereby they claim that notice to Fred M. Barnet was notice to Broad. This argument is *Page 381 
without merit, not only because I conclude that Fred M. Barnet did not have full and complete notice of the facts but because notice to the president of Broad was not, under the circumstances in this case, notice to the company. There is no evidence that Fred M. Barnet was ever authorized by Broad to act as its agent or manager in the premises. See Knopf v. Alma Park, Inc.,105 N.J. Eq. 299; affirmed, 107 N.J. Eq. 140. See, also, MyrtleAvenue Corp. v. Mt. Prospect Building and Loan Association,112 N.J. Law 60. In the present case there were a number of stockholders of record, such as Mr. Britt; Mr. Kull, who was the nominee of the Hudson County National Bank; Edward Maxon; Martin W. Stanton; Thomas J. Stanton; Samuel Stock, receiver of the National Bank of North Hudson, and H. Clifford Steffans. The only stockholder called as a witness was Judge Stanton who testified on behalf of the complainant, as above stated, that Warren never disclosed to him, or at any meeting of the directors or shareholders of Broad which he attended, the real facts pertaining to the purchase of the Valco mortgage or that Warren was Valco.
Defendant also argues in his brief that this suit is the product of greed and avarice. I find no merit in this contention. See Crocheron v. Savage, 75 N.J. Eq. 589.
After carefully considering the evidence, I have reached the conclusion that the defendant Warren obtained the Tillie O. Barnett mortgage by the improper use of confidential information and in violation of a duty which he owed to the Broad Street Corporation as its attorney.
Decree for the complainant.
I will refer the question of the amount due Broad, from the defendants, to one of the masters of this court, as the evidence before me is insufficient to accurately determine the same, unless the parties can agree on said amount without a reference. *Page 382