IN THE MATTER OF HERMAN G. HONIG, AN ATTORNEY AND COUNSELLOR AT LAW.

Argued May 12, 1952—Decided June 16, 1952.

For the respondent, *Mr. George F. Losche.*

The opinion of the court was delivered by

WACHENFELD, J. The Ethics and Grievance Committee of Bergen County, on a complaint made, held a formal hearing and took the testimony of the parties in interest and others, after which it unanimously submitted a presentment setting forth:

"* * * this Committee is of the opinion that the said attorney, Herman G. Honig, is guilty of unethical and improper conduct in that he abused and took advantage of the confidence reposed in him by his client for his own personal benefit and gain and that he failed to respect the trust reposed in him by his client."

As a result, we issued an order to show cause, directed to the respondent, why he should not be disbarred or otherwise disciplined.

He is an attorney and counsellor at law practicing in Waldwick and was also the municipal magistrate of the Borough of Allendale in Bergen County.

The disciplinary proceedings were initiated by Leon R. Kornhoff, a real estate broker.

In the fall of 1950, Kornhoff was critically ill and intended to enter a hospital for a serious operation. He was also in financial difficulty and made an agreement with a friend of his, Berkowitz, whereby he was going to convey his property to Mr. Berkowitz and "* * * in three months' time, if I don't sell it, or redeem it, he keeps it."

For the purpose of having this deed prepared, Kornhoff, on Saturday, November 25, 1950, the day he was to be hospitalized, called at the office of the respondent, Honig, whom he had known for some ten years and who on prior occasions had done legal work for him. Honig warned Kornhoff that under the proposed arrangements he was in danger of losing his house to Berkowitz and offered to give Kornhoff a "better break."

The testimony is at variance as to Honig's proposal. According to Kornhoff, he understood Honig was to take over the property, with Kornhoff and his aged mother, who dwelt with him, having the right to live there rent free for one year, he retaining the right to redeem his property any time within the year by reimbursing Honig for all expenses; if Kornhoff did not survive the operation, the house was to be sold and, after deducting his disbursements and outlays, Honig was to turn the balance of the proceeds over to the mother.

Honig's version, which we are inclined to believe, was that in return for an absolute conveyance of the property he agreed to provide Kornhoff and his mother with a place to live for one year, he paying all the overhead expenses.

In any event, Honig actually prepared a deed for the property to himself and Kornhoff executed it. He also prepared and had executed an agreement between them which read:

"For and in consideration of legal services rendered and the assumption of the mortgage now on the premises known as (description)

and the use and occupancy of said premises for a period of one year from the date hereof,

I, the said Leon R. Kornhoff, do hereby agree to convey the hereinabove premises to Herman G. Honig and I, Herman G. Honig, do hereby agree to accept the aforesaid conveyance under the terms above set forth."

At this time there was no money owing to Honig from Kornhoff for legal services.

Honig thereupon had the deed executed by Kornhoff's wife, from whom Kornhoff was separated, on the payment to her of $250, and had it recorded, showing himself as the unconditional owner of the property.

We think the respondent thus entered into an unconscionable bargain with a client who was without independent advice, was distraught by the possibilities of death in an impending operation and beset with financial difficulties. The oppressiveness of the transaction is indicated by the fact there was apparently a substantial equity in the property. Kornhoff estimated the value of the realty at $21,000 while the respondent's witness, also a real estate broker, placed it at $15,000. There was a balance outstanding on the mortgage against it of less than $9,800, with two payments of $93 each being in default.

Because of a hurricane and blocked roads, Kornhoff was prevented from going to the hospital on the appointed date but went the following day. The operation was successful and in a month Kornhoff returned home.

During the next two months Honig called on Kornhoff on several occasions and during their conversations no conflict of ideas as to the status of the property was expressed. Late in February or early in March, Honig received a notice from his landlord discontinuing his tenancy and approached Kornhoff with respect to the latter's vacating his home in favor of Honig, who offered to compensate him financially for the balance of the agreed one-year term of occupancy.

Kornhoff did not assent to this proposal and retained another attorney, and on March 8, 1951, a letter was sent to

Honig offering to pay him whatever sums were due in connection with the property and demanding a reconveyance. Honig wrote in reply that he expected Kornhoff to live up to the terms of the contract and the deed executed on November 25, 1950.

Negotiations being unsuccessful, an action was instituted on behalf of Kornhoff against Honig to recover the property. It was eventually settled by Kornhoff reimbursing Honig for all money expended by him in connection with the property and in addition paying Honig $600. Honig then reconveyed the property to his erstwhile client.

The respondent admits his behavior in this matter "is subject to some criticism." We find his conduct is a violation of Canon 11 of the Canons of Professional Ethics of the American Bar Association. By *Rule* 1:7–6, made to govern the conduct of the members of the bar of this State, "The lawyer should refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client."

All fiduciaries are held to a duty of fairness, good faith and fidelity, but an attorney is held to an even higher degree of responsibility in these matters than is required of all others. 536 *Broad St. Corp. v. Valco Mtge. Co., Inc.,* 135 *N. J. Eq.* 361 (*Ch.* 1944), affirmed *o. b.* 138 *N. J. Eq.* 431 (*E. & A.* 1946). See also *Dunn v. Dunn,* 42 *N. J. Eq.* 431 (*E. & A.* 1886); *Crocheron v. Savage,* 75 *N. J. Eq.* 589 (*E. & A.* 1909); *Presbyterian Church v. Plainfield Trust Co.,* 139 *N. J. Eq.* 501 (*Ch.* 1947); 7 *C. J. S.* 964, *Attorney & Client, Sec.* 127; 5 *Am. Jur.* 287, *Attorneys at Law, Secs.* 48 and 49.

A member of the bar must act in good faith and deal fairly with his clients. He is not privileged to exercise an advantage which will in any respect prove detrimental to his client's interests.

The respondent's over-reaching was occasioned by the application of a false standard of comparison. He thought, inasmuch as his offer was better than the one already made to

his client, he was justified in arranging the terms ultimately agreed upon.

As to the client, we think because of his 25 years' experience in the real estate business he was fully cognizant of the transaction and fully consented to it, but this does not exonerate the respondent.

The exigencies of the situation are stressed by respondent's counsel, contending Honig had to act quickly and "in acting quickly he acted erroneously." Even if this be true, there was a noticeable reluctance, as a matter of fact a direct refusal, to release what he had acquired when he was subsequently asked for a return of the property.

We are in accord with the findings of the Bergen County Ethics and Grievance Committee that the respondent was guilty of improper conduct and we so find.

The punishment to be imposed always presents a difficult and distasteful task but the obligation is nevertheless ours. Although the respondent's conduct trespassed upon the high standard established, there were some mitigating circumstances that equity and fairness direct should be given consideration.

The respondent has been a member of the bar in good standing for 24 years and bears a good reputation in the community in which he lives. He returned to Kornhoff, at our suggestion, the $600 previously paid him in settlement, for which he had a general release that would have barred such a recovery. His resignation as a magistrate of the Municipal Court of the Borough of Allendale while this proceeding against him was pending removes the necessity of our considering any further question with respect thereto and is an indication of his belated realization of the impropriety of his conduct. His self-removal reflects repentance, which in turn adumbrates the possibility of a moral awakening.

Our judgment is that he be suspended from the practice of law for a period of two years and until the further order of this court.

VANDERBILT, C. J. (dissenting). Honig struck his unconscionable bargain with his seriously ill and financially distressed client on November 25, 1950, persisted for months thereafter in his efforts to enforce it and to the date of the hearing before this court he evidenced no sign of repentance. Before the Ethics and Grievance Committee and before this court he has sought to justify his wrongful conduct by a variety of explanations, none convincing.

First, his brief states that he "labored under the mistaken belief that he was justified in dealing with Mr. Kornhoff other than as a client." But how could this be when he had dealt with Kornhoff as a client in the past and when Kornhoff came to his office on this occasion before leaving for the hospital for a very serious operation expressly for the purpose of having him draw a deed to a third party? Moreover, at the hearing before the Ethics and Grievance Committee Honig testified:

"Q. Mr. Honig, you recognized that you were performing a legal service for Mr. Kornhoff that morning as soon as he asked you to prepare a deed, didn't you? A. Yes.

Q. And you realized that you were dealing with him then as a client, didn't you? A. That is right, Sir.

Q. Then didn't it occur to you that you shouldn't deal with a client in the way that you were, namely, getting from him this property under those circumstances? A. Well, it is hard to explain that." (*page* 78)

Second, he attempts to justify his conduct by saying in his brief that he "thought he was giving Mr. Kornhoff a better proposition than was offered him by Mr. Berkowitz and that since it was an improvement Mr. Kornhoff should have been satisfied." This is not the language of repentance by one who recognizes his responsibilities as an attorney but rather a brazen attempt to justify his position by suggesting a standard of professional conduct which fails completely to comprehend the true nature of the attorney's obligation to his client.

Third, in his brief it is stated that "no complaint can be found of Mr. Honig's treatment of the mortgage situation,"

but the uncontradicted facts indicate otherwise. Kornhoff desired to assure his mother a home in the event he should not survive his operation and Honig was well aware of this, for he testified at the hearing:

"The only thing that I could do or I might consider is, if you convey the title to me, I will guarantee to you that your mother and you will have a place to live for a year, after you sign the agreement."

Nowhere, however, did Honig even mention the mother in the odd agreement which accompanied the execution of the deed absolute by Kornhoff to him, and significantly Honig did not provide Kornhoff with a copy of the agreement so that in the event of Kornhoff's not unexpected death his mother would have had no evidence of the arrangement her son had made. The agreement, moreover, was false in reciting that it was "For and in consideration of legal services rendered," since at the hearing Honig admitted that Kornhoff did not owe him anything for legal services.

Fourth, Honig attempts to justify his conduct by pointing out that Kornhoff was an experienced real estate broker who knew the difference between a deed and a mortgage, apparently inferring that the standard of the market place, *caveat emplor*, is applicable to the dealings of attorney and client. Not only is the inference unacceptable as contrary to Canon 11 of the Canons of Professional Ethics:

"The lawyer should refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client. * * *."

but the argument completely overlooks the fact that at the time Kornhoff, experienced though he may have been, was distraught by the specter of death—he was to be hospitalized that afternoon for an operation which he knew might be fatal—and distressed at the financial straits in which he found himself.

Fifth, Honig did not even live up to his agreement with Kornhoff, but in February or March endeavored to get Kornhoff to turn over possession of his home long before the expiration of the one-year period by offering to compensate him for its use for the balance of the year. Kornhoff refused, but offered to pay Honig whatever sums were due him in connection with the property and demanded a reconveyance, to which Honig replied by insisting that Kornhoff live up to the terms of the contract, despite the fact that Honig was now fully aware, if he had ever been unaware, of all the facts as to how much he stood to gain at his client's expense. Indeed, Honig admits that he may have asked $5,000 for the settlement of his claim to the property, as testified to by Kornhoff. Negotiations being unsuccessful, an action was instituted on behalf of Kornhoff against Honig to recover the property. This action was eventually settled by Kornhoff reimbursing Honig for all money expended by him in connection with the property and in addition paying Honig $600 and by Honig reconveying the property. Following this settlement Kornhoff brought the matter to the attention of the Bergen County Ethics and Grievance Committee which, after hearing, submitted a unanimous presentment to this court. The $600 exacted by the respondent from his client for the settlement of his outrageous claim was not refunded until after the argument of this matter before us, and then only as the result of our direct suggestion that it be done forthwith, and his resignation likewise was not forthcoming until after the argument here. The refunding of this $600, moreover, did not make Kornhoff whole, for the record shows that he expended at least $1,000 for attorney's fees in his efforts to recover the property that was his.

The respondent here not only took undue advantage of a client who was peculiarly in need of trustworthy professional assistance, but he persisted for months in the prosecution of his reprehensible course of conduct to keep his client's property. His was no error in judgment occasioned by the temptation of the moment, but a crafty scheme for his own

enrichment at his client's expense; a scheme quickly devised, to be sure, yet pursued at leisure. A lawyer's character is not to be determined by his transactions with the strong but by his dealings with the weak. It is not the integrity occasioned · by compunction, but the moral fibre revealed in the midst of temptation that is the true measure of a man. As the majority recognizes, every attorney owes an unyielding obligation to his client to serve him faithfully, fairly and honestly and that in the performance of this obligation he is held to a higher standard than that required or expected of other fiduciaries, 536 *Broad St. Corp. v. Valco Mortgage Co., Inc.*, 135 *N. J. Eq.* 361, 377 (*Ch.* 1944), affirmed *o. b.* 138 *N. J. Eq.* 431 (*E. & A.* 1946). But it is of no protection to the client to establish a sound standard by words if rigid adherence thereto is not required in fact. The respondent by his conduct in this matter has shown such a lack of those qualities essential in every lawyer that he should not be permitted again to prey upon those who might similarly come to him in their hour of need. The duty of imposing discipline on an attorney is not a pleasant one, but in the interest of the public and to protect the reputation of the thousands of lawyers in the State who faithfully abide by the Canons of Professional Ethics the duty must be performed unflinchingly and that discipline imposed which the facts clearly warrant.

I would strike the respondent's name from the rolls as an attorney and counsellor at law. I am authorized to say that Mr. Justice OLIPHANT and Mr. Justice BRENNAN join in this dissent.

*For two-year suspension*—Justices HEHER, WACHENFELD, BURLING and JACOBS—4.

*For disbarment*—Chief Justice VANDERBILT, and Justices OLIPHANT and BRENNAN—3.