821 A.2d 531 (2003)
360 N.J. Super. 76
Gus KAMARATOS, Victoria Kamaratos and North East General Contractors, Inc., Plaintiffs-Appellants,
v.
Konstantinos PALIAS, a/k/a Kostas Palias, Defendant.
Dakis Construction, Inc., a New Jersey Corporation, Plaintiff,
v.
North East General Contractors, Inc., a New Jersey Corporation, Defendant.
Dimitirous Hadjimarkos and Michael Psomias, Plaintiffs,
v.
North East General Contractors, Inc., a New Jersey Corporation, Defendant/Third Party Plaintiff,
v.
Gus Kamaratos, Victoria Kamaratos and West Side Contracting, Inc., Third Party Defendants.
West Side Contracting, Inc., a New Jersey Corporation, Plaintiff,
v.
North East General Contractors, Inc., a New Jersey Corporation, The Ohio Casualty Insurance Company, a corporation of the State of Ohio, Housing Authority, City of Newark, NJ, and Kostas Palias, Defendants.
Superior Court of New Jersey, Appellate Division.
Submitted January 23, 2003.
Decided May 6, 2003.
*533 Hilton L. Stein, Montville, attorney for appellants (Mr. Stein, of counsel; Diane M. Acciavatti, on the brief).
Respondent, Frank T. Araps, North Brunswick, submitted a pro se brief (Mr. Araps and Margaret Shaara O'Brien, on the brief).
Before Judges WEFING, LISA and FUENTES.
*532 The opinion of the court was delivered by WEFING, J.A.D.
Plaintiffs appeal from an order of the trial court granting the motion of Frank T. Araps, Esq. to compel arbitration of their dispute about the legal fees allegedly due and owing to Araps. We reverse.
Gus Kamaratos and his wife, Victoria Kamaratos, ("Kamaratos") were minority shareholders in North East General Contractors, Inc., a company engaged in the construction business. They retained Araps to represent their interests in connection with a dispute with the majority shareholder, Kostantinos Palias. On February 26, 1997, they signed a retainer agreement, captioned "Agreement to Provide Legal Services". The agreement, in addition to dealing with such matters as the scope of the work to be performed and the hourly rates to be charged, included the following provision.
Any controversy and/or dispute between the Law Firm and You regarding Fees or any controversy, claim, dispute or other matter in question arising out of or relating to this AGREEMENT, or the breach thereof, shall be resolved by binding arbitration between the parties. Arbitration shall be in accordance with the New Jersey Uniform Arbitration Act, N.J.S.A. 2A:24-1, et seq. The arbitration shall be subject to Your right under the Rules Governing the Courts of the State of New Jersey R. 1:14, "Code of Ethics", Rules of Professional Conduct RPC 1.5, "Fees", then obtaining.
Arbitration shall be commenced by the aggrieved party (Claimant) by filing a demand for arbitration directly with the other party (Respondent). Respondent shall file an answering statement with the claimant within seven days of receipt of the demand for arbitration. Within ten days thereafter the parties and/or their counsel shall communicate with each other in [an] attempt to identify a mutually acceptable arbitrator. Although the hearings will not be administered by the American Arbitration Association, they will be governed by the Commercial Industry Arbitration Rules of the American Arbitration Association then obtaining, and in particular those rules which provide for expedited administration and resolution. In the first instance, the cost for the arbitrator shall be shared by the parties, but the arbitrator shall have the right to allocate arbitrator and arbitration costs in the final award. Should the parties be unable to agree upon an arbitrator within the ten day period following the filing of the answering statement, either party may then apply to the American Arbitration Association (AAA) for the purpose of engaging the AAA for the limited purpose of the appointment of an arbitrator(s) in accordance with their then prevailing rules. Once an arbitrator(s) *534 has been appointed by the AAA, the parties shall go forward with the administration of the dispute. If in the opinion of any party, there arises a problem or unreasonable delay with the administration of the dispute, including but not limited to the scheduling of any hearing, any party upon 10 days written notice to the other, shall have the right and power to notify and engage the AAA to commence formal administration of the proceeding before the American Arbitration Association in accordance with its then prevailing rules. In that event, the Commercial Industry Arbitration Rules of the American Arbitration Association then obtaining, and in particular those rules which provide for expedited administration and resolution, will govern the continued processing and resolution of the dispute. The award rendered by the arbitrator(s) shall be final and may be confirmed in any court having jurisdiction thereof.
Attached to the Agreement was a "Professional Fee and Expense Schedule." Paragraph O of this Schedule repeated the provision for arbitration of fee disputes.
Araps commenced work on their behalf, and in June 1997 he filed a seven-count verified complaint in the Chancery Division against Palias, seeking relief as an oppressed minority shareholder and asserting, inter alia, claims of breach of fiduciary duty, fraud, and defamation. By July, Araps and the attorney representing Palias were able to negotiate a partial resolution on behalf of their respective clients. They agreed to continue with the litigation of the remaining claims. Eventually, this Chancery litigation was transferred to the Law Division and consolidated with three other law suits involving related claims and parties.
As the litigation continued, Kamaratos began to challenge the bills submitted by Araps. The parties met on February 11, 1998. Araps prepared a letter, dated March 19, 1998, to memorialize the understandings reached at that meeting. The first four items set forth by Araps in this letter were as follows:
1. If we cannot reach a mutually acceptable settlement of my fee balance due at the conclusion of the case, that we will submit the fee dispute to the appropriate fee arbitration committee in accordance with the rules promulgated by the Supreme Court. It was further agreed that you will have the right to challenge all of my bills for this matter.
2. We agree to defer fee arbitration on my fees pending the outcome of your case against Palias. I do this as an accommodation to relieve you of the burden of being involved with a multitude of disputes at the same time. It is also possible, based upon the outcome of your suit, that we will be more likely able to reach a negotiated settlement of my fees at the conclusion of your case.
3. You wish me to continue as your attorney.
4. Provided we are able to reach a mutually satisfactory interim fee settlement and you are in agreement with my advice and follow my recommendations for the handling of this lawsuit, I have agreed to continue as your attorney.
Kamaratos signed this letter and returned it to Araps. At the time, Kamaratos owed more than $80,000 to Araps for legal services.
Almost a year later, Kamaratos decided to retain new counsel in place of Araps. In February 2001, Araps filed a petition pursuant to N.J.S.A. 2A:13-5 with the Chancery Division to establish an attorney's *535 lien. He asserted within his petition that he was owed more than $115,000 in fees for his legal services. Kamaratos responded by invoking the fee arbitration mechanism under R. 1:20A. The fee arbitration committee, however, declined to hear the matter in light of the amount in controversy. R. 1:20A-2(b)(4).
Araps then filed a motion to stay his petition to establish a lien and, in accordance with the letter agreements of February 26, 1997 and March 19, 1998, to compel arbitration of the parties' dispute about legal fees. The trial court granted the motion to compel arbitration and Kamaratos has appealed.
Kamaratos argues on appeal that a clause in a retainer agreement that mandates arbitration of a fee dispute is against public policy and unenforceable. Araps responds that the clause was freely negotiated between the parties and fully in accord with New Jersey's strong policy in favor of arbitration.[1] We are unable to subscribe entirely to either position in the context of this matter and reverse.
There is no reported New Jersey opinion which directly decides the question before us. Other jurisdictions have, with different results. Cases are collected in Jane Massey Draper, Annotation, Validity and Construction of Agreement Between Attorney and Client to Arbitrate Disputes Arising Between Them, 26 A.L.R. 5th 107 (1995). The Restatement recognizes there is nothing inherently improper about a lawyer and client agreeing to arbitrate a fee dispute under general arbitration statutes. The agreement, however, must "meet standards of fairness, particularly as regards designation of arbitrators." Restatement (Third) of The Law Governing Lawyers § 42 comment b(iv) (2000).
There is no doubt that New Jersey has a strong policy favoring arbitration as a tool to resolve disputes. Perini Corp. v. Greate Bay Hotel & Casino, Inc., 129 N.J. 479, 489, 610 A.2d 364 (1992) (noting that "our courts have long encouraged the use of arbitration proceedings as an alternative forum"); Barcon Associates, Inc. v. Tri-County Asphalt Corp., 86 N.J. 179, 186, 430 A.2d 214 (1981). Indeed, so strongly does New Jersey favor arbitration that we permit parties to provide in separation agreements for arbitration of disputes over alimony and child support. Faherty v. Faherty, 97 N.J. 99, 108, 477 A.2d 1257 (1984) ("In this sensitive and intensely private area of domestic disputes, arbitration expressly contracted for by the spouses is highly desirable."). In light of that strong judicial approval for the technique of arbitration, it would strike us as somewhat anomalous to conclude that parties may not agree in advance that arbitration will be the sole remedy for a dispute about legal fees.
New Jersey is equally committed, on the other hand, to assuring that a party does not unwittingly lose the "time-honored right to sue." Garfinkel v. MOGA, 168 N.J. 124, 132, 773 A.2d 665 (2001), quoting Marchak v. Claridge Commons, Inc., 134 N.J. 275, 282, 633 A.2d 531 (1993), holding that plaintiff, under an agreement that "any controversy or claim arising out of, or relating to, this Agreement ... shall be settled by arbitration," did not waive his remedies under the Law Against Discrimination, N.J.S.A. 10:5-1 et seq. Garfinkel, supra, 168 N.J. at 134, 773 A.2d 665. Accordingly, a "waiver-of-rights provision must reflect that an employee has agreed clearly and unambiguously to arbitrate the disputed claim." Leodori v. CIGNA, 175 N.J. 293, 814 A.2d 1098 (2003).
*536 Leodori is instructive of the "clear and unambiguous" proof required of such a waiver. Plaintiff in that case had served as an in-house attorney who asserted that he was terminated in violation of the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1 to -8. Id. at 295-96, 814 A.2d 1098. During the course of his employment, Leodori acknowledged receipt of the employee handbook which provided for the arbitration of all employment disputes. Id. at 297, 814 A.2d 1098. It provided:
The agreement to arbitrate applies to serious employment-related disagreements and problems, which are those that concern a right, privilege, or interest recognized by applicable law. Such serious disputes include claims, demands, or actions under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, the Civil Rights Act of 1991, the Equal Pay Act, the Age Discrimination in Employment Act, the Employee Retirement Security Act of 1974, the Fair Labor Standards Act, the Rehabilitation Act of 1973, the Americans with Disabilities Act, the Family and Medical Leave Act, and any other federal, state, or local statute, regulation, or common law doctrine, regarding employment discrimination, conditions of employment, or termination of employment.
Plaintiff signed the acknowledgment for receipt of the handbook, which stated that he had reviewed the "information on policies, programs and services for employees." Ibid. In connection with the distribution of that handbook, the employer also prepared a separate form, "Employee Handbook Receipt and Agreement" which stated:
This is to acknowledge that I have received my copy of the July 1998 employee handbook, You and CIGNA. I understand that by accepting employment and being eligible to receive increases in compensation and benefits, I am agreeing to the following two important terms of my employment described in You and CIGNA: (1) my employment can be terminated by me or my employer at any time for any reasontherefore, my employment is at the will of either party, and (2) I will use the Company's internal and external employment dispute resolution processes to resolve legal claims against the Company therefore rather than go to court or to a government agency for a hearing to decide my legal claim, I will submit my employment related legal claims except workers' compensation and unemployment compensation to final and binding neutral third party arbitration. I understand further that these two terms of my employment replace and supersede any prior agreement concerning these terms and cannot be changed except in writing signed by me and the president of the Company.
Plaintiff did not sign this form. Id. at 298, 814 A.2d 1098. Despite the Court's agreement that plaintiff knew of the employer's arbitration policy throughout the term of his employment, Id. at 303, 814 A.2d 1098, it declined to enforce the waiver-of-rights provision in the absence of plaintiff's signature or other "unmistakable indication" that he had agreed to arbitrate his claims. Id. at 305, 814 A.2d 1098. Plaintiff was thus allowed to proceed with his CEPA suit.
We turn now to the clause at issue. We recognize at the outset that we are dealing with an agreement between an attorney and his client. Clearly, the relationship between the two is a fiduciary one, calling for the highest trust and confidence. In re Honig, 10 N.J. 74, 78, 89 A.2d 411 (1952) ("All fiduciaries are held to a duty of fairness, good faith and fidelity, *537 but an attorney is held to an even higher degree of responsibility in these matters than is required of all others."). The relationship is governed both by the Rules of Professional Conduct and the Supreme Court's exclusive jurisdiction to regulate the conduct of attorneys. N.J. Const. art. VI, § 2, ¶ 3. However, that a subject area may be one in which the courts have a "non-delegable, special supervisory function," Faherty, supra, 97 N.J. at 109, 477 A.2d 1257, does not preclude its arbitrability (holding that while questions of child support may be arbitrated, any arbitration award is subject to a special review before it may be confirmed in light of the court's traditional parens patriae responsibility).
Our Supreme Court has already indicated that there is nothing inherent in the attorney-client relationship which would mandate a blanket preclusion of the arbitration of fee disputes. Daly v. Komline-Sanderson Engineering Corp., 40 N.J. 175, 177, 191 A.2d 37 (1963) (upholding an agreement to arbitrate a dispute over legal fees, stating there was "no substance" to the contention that the agreement intruded on the Court's exclusive jurisdiction over the practice of law).
The Court has also recognized that when called upon to construe the enforceability of particular aspects of a retainer agreement, "courts may consider the circumstances in which the agreement was made, the parties' past practices and agreements, the extent to which they actually negotiated the agreement, and the client's level of sophistication or experience in retaining and compensating lawyers." Cohen v. ROU, 146 N.J. 140, 160, 679 A.2d 1188 (1996). It has also recognized that "innovative fee arrangements" are not necessarily inappropriate, particularly in the face of rising legal costs. Id. at 162, 679 A.2d 1188. In addition, this court has recently recognized that attorneys may properly place within the retainer agreement a limitation on the scope of the representation to be provided. Lerner v. Laufer, 359 N.J.Super. 201, 217-19, 819 A.2d 471 (App.Div.2003).
We do not concur with respondent's position that Daly, supra, is dispositive. Daly is distinguishable in several regards. First, the agreement to arbitrate any fee dispute was apparently not placed in the initial retainer agreement but was made later, when the dispute arose. Id. at 177, 191 A.2d 37. Although some commentators have suggested that agreements to arbitrate a fee dispute are permissible if entered into after a dispute has arisen, as opposed to before, Clark, The Legal and Ethical Implications of Pre-Dispute Agreements Between Attorneys and Clients to Arbitrate Fee Disputes, 84 Iowa L.Rev. 827 (1999), in our judgment, all other things being equal, the timing of the clause should not affect its validity. A client is as able to make a reasoned decision, or to be overborne, at either stage of the proceedings.
Secondly, the Court's decision in Daly predated the adoption of the fee arbitration mechanism contained in R. 1:20A. However, the Court's jurisdiction over the practice of law, created by our Constitution, N.J. Const. art. VI, § 2, par. 3, was plenary and exclusive when the Daly court issued its opinion, as the Court itself recognized. Daly, supra, 40 N.J. at 177, 191 A.2d 37. Implementation of the fee arbitration rule did not represent an expansion of the Court's exclusive jurisdiction over the practice of law, only an implementation of it. In re LiVolsi, 85 N.J. 576, 428 A.2d 1268 (1981).
We note that, read literally, the subject clause could be interpreted as an attempt to supersede the scope of R. 1:20A. The parties have not interpreted it in that manner, however, and Araps, in *538 his brief to this court, recognizes that a client's right to invoke fee arbitration under R. 1:20A takes precedence. The manner in which the parties by their conduct indicate their own understanding of their agreement is an appropriate source to which to turn to determine the scope and meaning of their agreement. State Troopers Fraternal Assoc. v. New Jersey, 149 N.J. 38, 50, 692 A.2d 519 (1997).
Were Araps to contend that under the literal terms of this agreement, plaintiffs gave up their right to invoke the remedy of fee arbitration under R. 1:20A, we would have no hesitancy in striking down any such attempt to encroach upon the constitutional authority of the Supreme Court. He has not made that argument, however, and we interpret the contractual provision to include an implied recognition of the primacy of R. 1:20A.
Finally, the individuals selected to serve as arbitrators in Daly were attorneys and, thus, presumably sensitive to all the ethical ramifications of the dispute. Id. at 178, 191 A.2d 37. Here, the agreement calls for the arbitration to be governed by the commercial industry rules of the American Arbitration Association, with no specification of the particular qualifications of the proposed arbitrator. This latter distinction causes us to reject the position of the trial court, that plaintiffs, having initially chosen fee arbitration under R. 1:20A, could not be heard to object to commercial arbitration after the fee committee declined jurisdiction.
The fee arbitration process is designed to afford a client a "swift, fair and inexpensive" method to resolve fee disputes. Saffer v. Willoughby, 143 N.J. 256, 263, 670 A.2d 527 (1996) (quoting In re LiVolsi, 85 N.J. 576, 601-02, 428 A.2d 1268 (1981)).
If that method is unavailable, we do not consider it appropriate to hold a client to the limited appealability of a commercial arbitration award, N.J.S.A. 2A:24-8, and a waiver of the right to a jury trial, without a clearer statement that the client understands those sequelae of an agreement to arbitrate. There are other practical distinctions as well between an arbitration under R. 1:20A and a general arbitration. Arbitration under R. 1:20A involves payment of a fifty dollar administrative filing fee. R. 1:20A-3(a)(2). Under this agreement, however, the arbitrator was empowered to allocate the costs of the arbitration.
We noted earlier that the waiver-of-rights clause at issue in Leodori, supra, specified the statutory rights encompassed within the agreement to arbitrate. Further, the employee handbook stated that the company's policy was "intended to prevent an employee from going to court over employment-related disputes." Additionally, the Receipt and Agreement stated that the employee, "rather than go to court" would "submit [his] employment related legal claims except workers' compensation and unemployment compensation to final and binding neutral third party arbitration."
As the Court noted in Cohen v. ROU, supra, it can be impractical for a client to consult independent counsel before signing a retainer agreement. 146 N.J. at 162, 679 A.2d 1188. Here, although the retainer agreement referred to the arbitration statute, it did not clearly state the consequences of an agreement to arbitrate disputes over legal fees. The potential effect of an agreement to arbitrate must be clear to the client to be binding upon him. Haynes v. Kuder, 591 A.2d 1286 (D.C.App.1991) ("[W]hen a retainer agreement contains an arbitration clause, `the attorney has the obligation to make a full disclosure to the client of all the ramifications of an agreement to arbitrate, *539 including eliminating the right to sue in court and have a jury trial.'") (quoting D.C. Bar Comm. on Legal Ethics Op. No. 190 (1988)). It is not sufficient, moreover, that the client have experience in business to permit a conclusion that the client made an informed decision to agree to proceed with arbitration in all instances. In addition, an enforceable agreement should contain a clear statement that a client has an absolute right to proceed under R. 1:20A.
One final matter must be addressed. Although not part of the record in this matter, we are aware that subsequent to the trial court's order granting Araps's motion to compel arbitration, Kamaratos filed a legal malpractice action against Araps. We have no means to determine whether there is a "substantial basis for a malpractice claim" and thus do not address the interrelationship, if any, between arbitration of the fee dispute and the malpractice litigation. Saffer, supra, 143 N.J. at 268, 670 A.2d 527.
Kamaratos in his brief points to the existence of the malpractice claim as one reason why the arbitration provision is unenforceable. We reject that contention for two reasons. First, it was never raised before the trial court and, thus, the trial court had no opportunity to consider it. It is not appropriate to raise such an issue for the first time on appeal. Singer v. Commodities Corp., 292 N.J.Super. 391, 678 A.2d 1165 (App.Div.1996). Secondly, plaintiffs filed a motion seeking to supplement the record in this matter by including material relating to the allegation of malpractice, but we denied that motion, thus clearly indicating that this appeal involved only one narrow question, the arbitrability of fee disputes between an attorney and a client. Having denied the motion, we decline now to broaden the scope of what is before us.[2]
We do not consider it fruitful to speculate why a party who was willing to submit to arbitration under R. 1:20A would insist upon a civil trial as the forum in which to assert defenses to a suit for legal fees. We are satisfied, however, that absent a clearer statement, the election belongs to the client. We cannot conclude from this record that Kamaratos made an informed and voluntary waiver and, thus, we reverse.
For the reasons stated, the order compelling arbitration is reversed and the matter is remanded to the trial court for further proceedings.
FUENTES, J.A.D. (concurring)
I concur with the majority's decision to reverse the trial court's order enforcing a commercial arbitration clause inserted by attorney Frank T. Araps in the retainer agreement involving his clients, the Kamaratos. I write separately to express my disagreement with the reasoning underpinning the decision.
As a threshold issue, I do not agree with the majority's conclusion that, under the appropriate circumstances, commercial arbitration is a legally available forum to adjudicate disputes arising out of the attorney/client relationship. My conclusion is based on the combined effect of three separate factors: (1) the nature of the attorney/client relationship; (2) the plenary and exclusive authority of our Supreme Court to regulate the practice of law; and (3) the existence of the Supreme Court Fee Arbitration Committee.

*540 Attorney/Client Relationship

Trust is the bedrock upon which the attorney/client relationship is built. This fundamental principle was recently reaffirmed by our Supreme Court.
There are very few of the business relations of life involving a higher trust and confidence than that of attorney and client, or, generally speaking, one more honorably or faithfully discharged; few more anxiously guarded by the law, or governed by sterner principles of morality and justice; and it is the duty of the court to administer them in a corresponding spirit, and to be watchful and industrious, to see that confidence thus reposed shall not be used to the detriment or prejudice of the rights of the party bestowing it.
[State in the Interest of S.G., 175 N.J. 132, 139, 814 A.2d 612 (2003), citing In re Loring, 73 N.J. 282, 289-90, 374 A.2d 466 (1977) (quoting Stockton v. Ford, 52 U.S. (11 How.) 232, 247, 13 L. Ed. 676, 682-83 (1850)).]
The insertion of a commercial arbitration clause in a retainer agreement inherently violates this trust by pitting the lawyer's interests against the client's. The terms and features of an arbitration clause are designed, not for the client's benefit, but to protect and advance the lawyer's interest in a forum of his or her choosing. Adoption of such a practice places the lawyer in an irreconcilable ethical conflict which will only serve to undermine the public's confidence in the profession.
It can be argued that sophisticated clients, dealing at arms length with the attorney, should be free to negotiate the terms of their employment contract and mutually agree to resolve any future conflicts via the commercial arbitration route. Cohen v. Radio-Electronics Officers Union, Dist. 3, NMEBA, 146 N.J. 140, 161, 679 A.2d 1188 (1996). After all, in these unstable economic times, law firms which depend upon insurance companies, public agencies, or other large businesses for the majority of their revenue might persuasively argue that it is they who are at a disadvantage when it comes to negotiating the terms and conditions of a retainer agreement.
However, from an ethical perspective, it does not matter whether the particular relationship involves a three hundred lawyer firm dealing with a multinational corporation or a single practitioner retained by the victim of domestic violence. The lawyer has an ethical duty, in either scenario, to use his or her best efforts and professional judgment to advance the client's interest, not his or her own. Thus, a retainer agreement that contains a commercial arbitration clause which waives the client's right to access the courts to resolve disputes arising out of the attorney/client relationship must be viewed as inherently unenforceable and against public policy. Id. at 157, 679 A.2d 1188.

The Role of the Supreme Court
The New Jersey Constitution confers upon our Supreme Court exclusive and plenary authority over every aspect of the practice of law. N.J. Const., art. VI, § 2, ¶ 3; Knight v. City of Margate, 86 N.J. 374, 386-87, 431 A.2d 833 (1981); In Re LiVolsi, 85 N.J. 576, 585, 428 A.2d 1268 (1981); see also In re Jackman, 165 N.J. 580, 591, 761 A.2d 1103 (2000). Commercial arbitration clauses in legal retainer agreements constitute a radical departure from well-established practices and procedures for the adjudication of disputes arising out of the attorney/client relationship. Judicial endorsement of such a practice should therefore come directly from our Supreme Court.
Historically, the Court has commissioned studies and implemented pilot programs *541 designed to assess the impact new practices may have on both litigants and attorneys, e.g., child support hearing officers, domestic violence hearing officers, early settlement panels for matrimonial cases, juror questioning in civil trials and mandatory arbitration for civil disputes. This approach has allowed the Court to implement change organically, discarding proposals which proved unwise or unworkable, and adopting programs which have improved the administration and delivery of justice. I see no rational basis to exclude commercial arbitration arising out of the attorney/client relationship from this wise and well-established practice.

Fee Arbitration Committees
In establishing the District Fee Arbitration Committees, our Supreme Court took great care to comprehensively regulate every aspect of this alternative dispute forum. R. 1:20A-1(a) provides that the committee be comprised of not fewer than eight members, "at least four of whom shall be attorneys of this state and at least two of whom shall not be attorneys." The individuals appointed must also "either reside or work in the district or county in which the district is located." The Court also appoints the committees' presiding officers. R. 1:20A-1(c).
Under R. 1:20A-3(a)(1), the client has the exclusive right to submit a fee dispute to the committee for resolution. The lawyer is bound by the client's decision. The committees' jurisdiction is clearly delineated, R. 1:20A-2; the committee charges only a $50.00 administrative filing fee, R. 1:20A-3(a); and the procedures to be utilized during the arbitration hearing are described in detail:

Hearing Panel; Burden of Proof. All arbitration proceedings shall be heard before a hearing panel of at least three (3) members of the fee committee, a majority of whom shall be attorneys, except that in all cases in which the amount of the total fee charged is less than $3,000, the hearing may be held before a single attorney member at the direction of the chair. A quorum for the hearing of any matter in which the fee charged is $3,000 or more shall consist of at least three (3) members of the fee committee. The determination of a matter shall be made by a majority of the membership sitting on the hearing panel, provided a quorum is present. When by reason of absence, disability, or disqualification the number of members of the panel able to act is fewer than a quorum, with the consent of the client and the attorney the hearing may proceed before two members of the panel. The secretary of the Fee Committee shall not be eligible to sit on any hearing panel. The determination of a matter shall be made in accordance with R.P.C. 1.5. The burden of proof shall be on the attorney to prove the reasonableness of the fee in accordance with R.P.C. 1.5 by a preponderance of the evidence.

[R. 1:20A-3(b)(1) (emphasis added).]
I believe this comprehensive regulatory scheme is indicative of our Supreme Court's intent to preempt any other action affecting this critically important aspect of the practice of law. Thus, without explicit Supreme Court approval, the parties, by private agreement, cannot alter or expand upon the available dispute resolution options.
Commercial arbitration may be an efficient means of resolving disputes under the Uniform Commercial Code. Whether we should adopt a similar system to resolve disputes between lawyers and their clients is a profound question of public policy which should only be answered after a full and robust debate involving the bar, the public and the bench. However, after *542 the discussion is over, the only body constitutionally authorized to answer the ultimate question is our Supreme Court.
NOTES
[1] Neither party contends that the letter agreement of March 19, 1998 replaced the original agreement to submit a fee dispute to arbitration.
[2] In addition, Araps makes no contention before us that the arbitration agreement encompasses a claim for malpractice. We thus have no need to address the separate question of whether such an agreement is enforceable as a matter of policy.