**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3461-14T3
A-3550-14T3

MARK CHERNALIS, ANTHONY CHERNALIS, ONE SUNNY HILL ASSOCIATES LLC and TWO SUNNY HILL ASSOCIATES LLC,

Plaintiffs-Appellants/ Cross-Respondents,

v.

DEBRA TAYLOR, a/k/a DEBRA HELEN AZARIAN, ROBERT TAYLOR and THE ROBERT TAYLOR FAMILY URBAN FARMS REAL ESTATE TRUST,

Defendants/Third-Party Plaintiffs-Respondents/Cross-Appellants,

v.

RICHARD TAYLOR, ALETA TAYLOR, TOBOGGAN RIDGE PARTNERS LLC and SANDY RIDGE PARTNERS LLC,

Third-Party Defendants-Respondents.

---

MARK CHERNALIS, ANTHONY CHERNALIS, ONE SUNNY HILL ASSOCIATES LLC and TWO SUNNY HILL ASSOCIATES LLC,

Plaintiffs-Respondents,

v.

DEBRA TAYLOR, a/k/a DEBRA HELEN AZARIAN, ROBERT TAYLOR and THE ROBERT TAYLOR FAMILY URBAN FARMS REAL ESTATE TRUST,

Defendants/Third-Party Plaintiffs-Respondents/Cross-Appellants,

v.

RICHARD TAYLOR, ALETA TAYLOR, TOBOGGAN RIDGE PARTNERS LLC and SANDY RIDGE PARTNERS LLC,

Third-Party Defendants-Appellants/Cross-Respondents.

---

Argued February 14, 2018 – Decided June 7, 2018

Before Judges Koblitz, Manahan and Suter.

On appeal from Superior Court of New Jersey, Chancery Division, Bergen County, Docket No. C-000228-12.

Anthony X. Arturi argued the cause for appellants/cross-respondents (in A-3461-14) Arturi Law, LLC, attorneys; Anthony X. Arturi, of counsel and on the briefs).

Kevin P. Harrington argued the cause for appellants/cross-respondents (in A-3550-14) (Harrington and Lombardi, LLP, attorneys; Thomas R. Rumana, of counsel; Kevin P. Harrington, on the brief).

David M. Blackwell argued the cause for respondents/cross-appellants (in A-3461-14 and A-3550-14)(Donnelly Minter & Kelly, LLC, attorneys; David M. Blackwell and Patrick B. Minter, of counsel and on the briefs).

PER CURIAM

The dispute underlying these appeals stems from the purchase of a shopping center. The transaction was complex. It was structured to effectuate not only the purchase by a separate entity formed for the purpose of the acquisition, Urban Farms Acquisition LLC (Urban Farms). It was also structured to maintain family control despite the participation of outside investors and to channel profits and equity growth to the outside investors and family trusts for estate tax considerations. The transaction also included operating agreements and provisions relative to compensation.

Subsequent to the closing of the transaction, Mark and Anthony Chernalis (collectively plaintiffs) became aware that certain transactional documents provided defendants, Debra Taylor (Debra), Robert Taylor (Robert), and the Robert Taylor Family Trust and Urban Farms (RTT) (collectively defendants) with a greater interest than contemplated. Mark and Anthony, individually and in the capacity of their entities, One Sunny Hill Associates LLC and Two Sunny Hill Associates LLC, instituted an action, later amended, seeking defendants' expulsion from the management of the property as well as compensatory and punitive damages and counsel fees. Defendants filed an answer and counter-claim seeking compensatory damages and counsel fees. Defendants also filed a

third-party complaint naming Richard Taylor (Richard), Aleta Taylor, Tobaggan Ridge Partners LLC and Sandy Ridge Partners LLC, as third-party defendants, later amended, alleging breach of fiduciary duties and other tortious misconduct. The third-party defendants were outside investors.

A bench trial was conducted over several days in April and May 2014. Following the trial, the judge issued an opinion finding that Debra acted as an attorney for plaintiffs during the entirety of the transaction. The judge held that Debra failed to satisfy the stringent documentation and disclosure requirements for attorneys who enter into business ventures with their clients. As such, the judge held that the defendants' direct cash investment was terminated and to be refunded without entitlement to future earnings on the investment or to unpaid fees for services relating to the transaction.

The judge further held that defendants' interest in the property and their consequential compensation was greater than intended. However, the judge determined that the unintended interest and compensation was not the product of fraud or misconduct that would warrant disgorgement of any payments

defendants received or warrant an award of punitive damages or counsel fees.[1] For the reasons that follow, we affirm.

I.

We summarize the following from the voluminous record. Mark and Anthony operated a grocery and catering business known as The Market Basket. The Market Basket was the anchor tenant in a shopping center. Mark and Anthony desired to purchase the shopping center pursuant to a right of first refusal. Their first attempt to purchase the shopping center failed. Mark and Anthony were determined to succeed at the next opportunity, so they hired Debra, based upon her combination of skills as a financial advisor, licensed accountant, and lawyer.

As contemplated, Urban Farms would be comprised of three classes of individuals and entities that would receive compensation dependent upon their assigned class holder status. The outside investors, Class A, would participate in the property's appreciation and the preferred fixed return, or "dividend" of six percent on their direct cash investments. The Class A members would also receive thirty-five percent of the remaining earnings. The Class B members, comprised sole of Anthony and his wife, would

---

[1] Thereafter, the judge issued a supplemental opinion repeating the decision to deny counsel fees as well as certain post-judgment claims which are not the subject of these appeals.

share only in the preferred fixed return with any preferred dividend to be allocated to the Class C members.

By agreement, the property would be managed by a separate company, Merrywood Associates LLC (Merrywood), which Mark and Debra would run in exchange for a share of the operating profits. Debra's participation in Merrywood was not through her name but through RTT.

II.

Debra was the principal of Taylor Financial Group, which she described as a wealth management firm. Debra held securities licenses and an affiliation with a broker-dealer. She was a Certified Public Accountant (CPA) and a licensed real estate salesperson.

Debra was also an attorney, licensed to practice in New Jersey. She elected to retire from the practice of law in 2001, but subsequently returned to the practice in August 2012. During her retirement, Debra understood that she was ineligible to draft or to revise legal documents, to render legal assistance, or to give legal advice.

When their first attempt to acquire the shopping center failed, Mark and Anthony attributed the failure in part to the limitations of their counsel at the time. When the property became available again in 2009, Mark and Anthony were eager to pursue it

and sought Debra to assist them in the acquisition. Mark believed that Debra was "uniquely qualified" because she was an attorney and a CPA with experience in financial planning and estate planning, as well as in real estate. Mark and Anthony understood from the onset that Debra "was going to help quarterback the deal" by being "our attorney" and advising both the family and any other attorney that was to be involved. Mark believed that the arrangement was "perfect" because being a lawyer meant that Debra could "deal with legal aspects" in addition to "communications" and financing, which amounted to handling all aspects of getting the deal done.

Despite the absence of a written retainer agreement or any writing relative to the scope of services that Debra would provide, Mark and Anthony believed that she was, at all times, acting as their attorney.

A.

For purpose of the transaction, Debra recommended that the family hire a new accountant, Martin Goldstein, for his experience in real estate financing. Throughout the transaction, Goldstein operated in that capacity including developing the general structure for the investments and the interests in Urban Farms.

Debra also recommended that the family replace their prior attorney with an experienced real estate attorney, Jack Zakim.

Zakim was involved only with the negotiations with the lender and the property's owner. He viewed Debra's role in the transaction to be multi-faceted including as attorney, financial advisor and spokesperson for the family.

Debra also advised plaintiffs to retain the services of another attorney, Mark Press, to handle issues relating to outside investors. Press was involved in drafting documents relative to the operating agreements including those that provided for compensation to Richard, Mark and Debra. Press viewed Debra's role as a financial advisor to the Chernalis family who was involved in "orchestrating the entire transaction." Press relied on Debra to explain documents to the family although he did not agree that when doing so that she was necessarily acting as a lawyer. When Debra described her background to Press, she included being an attorney.

Debra requested that another attorney, David Edelbaum, who specialized in tax and estate planning, become involved. Edelbaum considered Debra's role to be a financial advisor only, despite knowing that she was an attorney and a CPA.

B.

Mark initially raised the issue of Debra's compensation as the family did not want to see "a huge bill all of a sudden." At first, Debra said that she was satisfied with compensation through

her work on The Market Basket's retirement plan and by future business referrals. However, as the transaction became more involved, Debra recommended her compensation come from a Class C share interest, which she referenced as a "co-promote fee," as is consistent with industry usage for participation in a transaction not arising from a tangible investment. Mark and Anthony agreed to this method of Debra's compensation. It was later agreed that the compensation would flow through Merrywood and that Debra's interest would be payable to RTT. The percentages of the compensation were stated explicitly in the numerous drafts of the operating agreements. It was also agreed that Debra could make a cash investment for a Class A interest in Urban Farms, but as an outside investor and not as compensation for her services.

C.

The closing on the property took place on December 17, 2009, although the parties executed the closing documents, including the operating agreements, two days earlier. The final version of the Merrywood operating agreement contained two class members. The Class A members were Mark, Toboggan Ridge Partners, LCC (Toboggan Ridge) and RTT.[2] The Class B members were Mark and RTT. The

[2] Toboggan Ridge was an entity used by Richard Taylor for his investment in order to remain under the bank's threshold requiring a personal lender to give a personal guarantee.

percentages assigned to the members of Class A became the focal point of contention when Mark and Anthony were apprised of them. Mark had seen a spreadsheet calculating the distributions for fiscal year 2009 pursuant to the Urban Farms operating agreement that included percentages far greater than those discussed by the parties for Debra's compensation. When Debra insisted that the percentages were in accord with the closing documents, this litigation ensued.

III.

At the conclusion of the bench trial, Judge Robert P. Contillo placed his decision on the record. In reaching his decision, Judge Contillo made the following factual findings.

The family engaged Debra because she "stressed" that her unique qualifications as a financial advisor, attorney and CPA, plus her substantial real estate experience, would let her handle both "the financial and real estate components of the transaction." Anthony and Mark "believed that her skill set was exactly what they needed to achieve their goal."

Debra advised them that she would quarterback the deal and assemble a team of professionals that would work together to represent the family in negotiations over the terms of acquisition, the requisite financing, the corporate structures of the acquisition, the post-acquisition management of the property, the

tax implications and the estate planning aspects of what was by all accounts a highly complex undertaking with multiple moving parts. Mark and Anthony lacked sophistication and experience about such matters, even though they were adept at managing their own business. They came "to depend heavily and primarily on Debra Taylor for advice and guidance in all these aspects of the deal."

Debra was responsible for ensuring that the family understood that she did not intend to provide legal advice and was ineligible to do so. She allowed them or led them to believe that she was willing and able to provide legal advice, and did not disclose her retirement from practice, which was only revealed after the closing.

While "[o]thers served discrete functions to the Chernalis family as the efforts to purchase got underway – lawyers, tax advisors, financial advisors, accounting advisors, estate planners, real estate advisors – [] Debra Taylor never ceased serving – serving well, but nevertheless serving – in each of those capacities." Zakim, although retained as an attorney, "always considered" Debra to be the family's counsel.

The original concept for the transaction did not include giving Debra a financial interest. The suggestions that Debra could make a capital investment or have a role in managing the property arose only after her attorney-client relationship with

the family had begun, and after "Mark and Anthony had come to depend upon her as their primary advisor." The notion that Debra was Mark's "partner in the transaction," was "a litigation construct, designed to obscure the fiduciary nature of Debra Taylor's fundamental role as the primary advisor to the Chernalis family."

Mark was "a credible and forthright witness." While Mark and Anthony agreed to give her "a piece of the deal," the "nature, extent and value of those interests remained amorphous and changing," to the extent that none of the other professionals was able to confirm the "compensation arrangement" that Debra was claiming to have reached with the family.

The family eventually agreed to let Debra make a cash investment for a Class A interest, and to give her a Class C interest as compensation for her services. Debra "never advised any Chernalis, orally or in writing, to seek independent advice" with respect to either of those interests. "No one else – none of the other professionals in the case – gave advice to any of the Chernalis family with respect to" those interests, and Debra "did not think and had no reason to think" otherwise. At no point during Debra's efforts to obtain a Class C interest did she seek "to clarify or memorialize[] her role as the Chernalis family legal advisor and advisor on all aspects of the transaction, or

her terms of compensation."

Debra served as Mark and Anthony's attorney "from the moment she agreed to represent their interests" in connection with acquiring the property. Debra "emphasized her credentials and skills as a lawyer" as well as her other abilities "to make the relationship adhere." Debra never told them that she intended to refrain from giving legal advice, or that any legal advice she gave should be confirmed by independent counsel. The legal advice advice and work that Debra performed, "quite competently," included reviewing the lease to discover the right of first refusal, reviewing the pleadings and giving legal advice in the lis pendens action, and being "deeply involved in the revision of complex legal documents deeply implicating the Chernalis family's rights, including the operating agreements and private placement memorandum."

The ability of professionals other than lawyers to read and interpret such documents was irrelevant, because "[w]hen you are someone's attorney and you are giv[ing] them legal advice," the relationship is established with all of its professional responsibilities. That the family signed a retainer agreement with one of the other attorneys for limited supplemental legal services in no way justified an inference that the family must have understood the lack of a retainer agreement for Debra to mean

that she was not providing any legal services or advice in the course of her uniquely central role in all aspects of the transaction.

Debra did not engage in fraudulent conduct nor engage in acts of intentional misrepresentation. The allegations in the third party complaint and the third party defendants' counterclaim seeking counsel fees were not supported by the proofs.

Having made these findings, the judge provided his conclusions of law. In doing so, the judge held the following.

Debra was bound by the Rules of Professional Conduct (RPCs). In serving the family as an attorney without a retainer agreement, Debra violated RPC 1.5(b). Debra's entry into a business transaction with the family, specifically, her Class C interest, violated most of the conditions of RPC 1.8(a), since she did not provide full written disclosure of the nature and extent of her interest in terms that the family could have been expected to understand, and because she did not advise them of the reasons why they should seek independent counsel about it. The inability of the other professionals in the transaction to confirm that the family intended Debra to have the 47.69% interest that she was claiming in Class C's 65% share of remaining available cash was further proof that she failed to comply with RPC 1.8(a).

The record contained no evidence to indicate what constituted

a "fair and reasonable" Class C interest for Debra to receive as compensation. The RPCs placed the burden of proof on Debra, and she did not meet her burden. Debra's violations of RPC 1.5(b) and RPC 1.8(a) made the terms of defendants' Class C interest unenforceable. Thus, defendants "cannot retain any Class C interest in [p]laintiffs' property."

Defendants' Class A interest was "a pure investment opportunity" and not controversial because it was not intended as compensation for any aspect of Debra's service to the family. There was "no suggestion that the Chernalis family failed to grasp the simple concept that Debra Taylor would get six percent on her money, with no management rights." There was also no suggestion that it was unfair or unreasonable for Debra to receive the same rate of return as other the Class A members. As such, Debra should not be penalized for acquiring the Class A investment. Notwithstanding, Debra must relinquish "her right to future interest payments" on the investment after a refund of her capital contribution.

Plaintiffs were not entitled to punitive damages based upon insufficient proof. Plaintiffs and third-party defendants were not entitled to counsel fees. The third-party complaint was dismissed based upon insufficient proof that Richard engaged in actionable conduct.

On appeal, plaintiffs raise the following arguments:

POINT I

THE $30,000 IN DIVIDENDS AND $160,000 IN MANAGEMENT FEES THAT DEFENDANTS RECEIVED THROUGH UNENFORCEABLE BUSINESS TRANSACTIONS BETWEEN LAWYER AND CLIENT SHOULD HAVE BEEN DEEMED PRINCIPAL AND CREDITED TO PLAINTIFFS.

POINT II

THE COURT SHOULD HAVE AWARDED PLAINTIFFS' LEGAL FEES THEY WERE FORCED TO INCUR BY THE INTENTIONAL MISCONDUCT OF DEBRA TAYLOR AS AN ATTORNEY.

POINT III

THE COURT SHOULD HAVE AWARDED LEGAL FEES TO PLAINTIFFS PURSUANT TO DIMISA v. ACQUAVIVA, 198 N.J. 547, 553-54 [] (2009), BECAUSE DEBRA TAYLOR'S BREACH OF FIDUCIARY DUTY FORCED PLAINTIFFS TO SUE A THIRD PARTY TO RECOVER BACK THEIR WRONGFULLY HELD PROPERTY INTERESTS.

POINT IV

THE EVIDENCE WARRANTED A PUNITIVE DAMAGE AWARD WHERE DEBRA'S BREACH OF DUTY AND CONVERSION OF A 47.69% INTEREST IN PLAINTIFF[S'] TRANSACTION WAS MADE WITH RECKLESS DISREGARD FOR THE HARM HER ACTIONS WOULD CAUSE TO HER CLIENTS.

POINT V

THE COURT SHOULD HAVE HELD DEBRA LIABLE FOR FRAUD BASED ON HER ADMISSIONS ABOUT WHAT SHE KNEW PRE-CLOSING.

On cross-appeal, defendants raise the following arguments:

POINT I

DEBBIE WAS NOT ACTING AS AN ATTORNEY FOR THE CHERNALIS FAMILY AND, AS SUCH, SHE DID NOT VIOLATE THE RULES OF PROFESSIONAL CONDUCT.

POINT II

THE OPERATING AGREEMENTS AS DRAFTED, REVIEWED, APPROVED AND SIGNED ACCURATELY SET FORTH HOW THE ACQUISITION WAS INTENDED TO BE STRUCTURED.

POINT III

THE CHANCERY DIVISION CORRECTLY DENIED THE PLAINTIFFS' APPLICATION FOR ATTORNEYS' FEES.

POINT IV

THE CHANCERY DIVISION CORRECTLY FOUND THAT THE DEFENDANTS NEED NOT DISGORGE EITHER THE CLASS A PREFERRED INTEREST DISTRIBUTIONS OR ANY MANAGEMENT FEES THAT WERE PAID.

POINT V

THE TRIAL COURT CORRECTLY FOUND THAT PLAINTIFFS WERE NOT ENTITLED TO PUNITIVE DAMAGES.

POINT VI

THE TRIAL COURT CORRECTLY FOUND THAT DEBBIE WAS NOT LIABLE FOR FRAUD.

On appeal, defendants/third-party plaintiffs raise the following arguments:

POINT I

RICH TAYLOR HAS ABANDONED ANY CHALLENGE TO JUDGE CONTILLO'S DISMISSAL OF HIS COUNTERCLAIM AND, IN ANY EVENT, THE COUNTERCLAIM WAS PROPERTLY [SIC] DISMISSED.

POINT II

THERE WAS NEVER ANY REQUEST FOR ATTORNEYS' FEES OR ORDER ENTERED DENYING ATTORNEYS' FEES AND, IN ANY EVENT, THE ATTORNEYS' FEES WERE PROPERLY DECLINED.

POINT III

THERE WAS SUFFICIENT EVIDENCE FROM WHICH THE CHANCERY COURT COULD HAVE FOUND IN FAVOR OF DEBBIE WITH REGARD TO THE CLAIMS IN THE THIRD-PARTY COMPLAINT AGAINST RICH TAYLOR.

On appeal, the third-party defendants raise the following arguments:

POINT I

THE COURT WRONGFULLY DISMISSED THIRD[-]PARTY DEFENDANT'S COUNTERCLAIM UNDER THE THIRD[-]PARTY EXCEPTION TO THE AMERICAN RULE ESPOUSED BY THE SUPREME COURT IN DIMISA v. ACQUAVIVA, 198 N.J. 547, 553-54 (2009).

POINT II

THE TRIAL COURT ERRED IN FINDING THAT THIRD[-]PARTY DEFENDANT DID NOT INCURR [SIC] ATTORNEYS['] FEES DISTINCTLY RELATED TO ROBERT TAYLOR AND THE TRUST'S INVOLVEMENT IN THE SUIT.

We review the factual findings made by a trial judge to determine whether they are "supported by adequate, substantial and credible evidence." Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974). Such findings made by a judge in a bench trial "should not be disturbed 'unless they are so wholly insupportable as to result in a denial of justice.'" Id.

at 483-84 (quoting Greenfield v. Dusseault, 60 N.J. Super. 436, 444 (App. Div. 1960)). Factual findings that "are substantially influenced by [the judge's] opportunity to hear and see the witnesses and to have the 'feel' of the case" enjoy deference on appeal. State v. Johnson, 42 N.J. 146, 161 (1964).

After carefully reviewing the record developed by the parties before Judge Contillo, we affirm substantially for the reasons expressed in his oral opinion and his supplemental opinion. We add the following.

An attorney-client relationship can exist even in the absence of "a specific retainer [agreement] memorializing" it. Kaye v. Rosefielde, 432 N.J. Super. 421, 477 (App. Div. 2013) (citing Seidman v. Clifton Sav. Bank, 205 N.J. 150, 169 (2009)), rev'd, in part on other grounds and remanded, 223 N.J. 218, 220-22 (2015) (reversing lower courts' blinkered view of their inherent discretion to fashion equitable remedies, and remanding only for new determination on remedy). "To form an attorney-client relationship, it is enough that the attorney has voluntarily agreed and acted as the client's legal advisor, and the client equally willingly sought and was guided by the attorney's counsel." Ibid. While the attorney must "affirmatively accept" that "professional responsibility," ibid. (quoting In re Silverman, 113 N.J. 193, 207 (1998)), the acceptance "need not necessarily be articulated,

in writing or speech but may, under certain circumstances, be inferred from the conduct of the parties." Ibid. (quoting In re Palmieri, 76 N.J. 51, 58-59 (1978)). As for the client, "there must be some act, some word, some identifiable manifestation that the reliance on the attorney is in his professional capacity," instead of "plainly no more than part and parcel of a joint business venture among sophisticated businessmen." Palmieri, 76 N.J. at 60.

The RPCs govern all attorney-client relationships. In re Greenberg, 155 N.J. 138, 152 (1997); Karamatos v. Paliaz, 360 N.J. Super. 76, 84 (App. Div. 2003). They "establish the state's public policies with respect to attorney conduct," and contracts between attorneys and clients, whether retainer agreements or for business transactions, "that violate the RPCs" in any way "violate public policy, and courts must deem them unenforceable." Jacob v. Norris, McLaughlin & Marcus, 128 N.J. 10, 17 (1992).

The disclosure requirements for business transactions between an attorney and client are stringent, in part because they are presumed to pose a conflict of interest. See RPC 1.8. Furthermore, the disclosure of every aspect of the attorney's interest, the explanation of the desirability of independent legal counsel for the client concerning the transaction, and the client's informed consent to the transaction must all be in writing. RPC

1.8(a). The attorney must also explain when his or her activity would represent the provision of legal services to the client as opposed to furtherance of their business interests. RPC 1.8(a)(3).

"[I]t is the substance of the relationship, involving as it does a heightened aspect of reliance, that triggers the need for the rule's prescriptions of full disclosure and informed consent." Silverman, 113 N.J. at 214.

In Silverman, the Court noted that, while an attorney-client relationship is not created simply because the attorney performs some tasks connected to the business venture with the client that lay persons are authorized to perform, the client's belief that the attorney "would exercise his legal skills for his benefit in carrying out these collateral tasks" can nonetheless establish sufficient reliance to create the relationship. Id. at 219-20.

Here, we discern no basis to disturb the judge's determination that Debra served as an attorney and obtained a financial interest in a business transaction in violation of the RPCs. The factual findings on this score were supported by sufficient credible evidence. The conclusions of law that flowed from those findings are unassailable.

An award of punitive damages should be reserved for special circumstances, where the conduct is particularly egregious. Maudsley v. State, 357 N.J. Super. 560, 590-91 (App. Div. 2003).

A party seeking punitive damages must prove by clear and convincing evidence that "the harm suffered was the result of . . . acts or omissions . . . actuated by actual malice or accompanied by a wanton and willful disregard . . . ." Longo v. Pleasure Prods., Inc., 215 N.J. 48, 58 (2013) (quoting N.J.S.A. 2A:15-5.12). We review the decision to deny punitive damages for abuse of discretion. Maudsley, 357 N.J. Super. at 590.

We are satisfied that the judge's decision not to award punitive damages is supported by substantial credible evidence in the record. Specifically, the judge found that Debra was not responsible for the inaccuracies in the final drafts of the operating agreements relative to the Class C interests. There was no proof that Debra was aware of the inaccuracies prior to the closing. Even though Debra sought to utilize the inaccuracies, post-closing, to her advantage, the judge did not find her conduct was malicious. Given our limited review of punitive damages awards, we find no basis to disturb the judge's finding.

"[A] reviewing court will disturb a trial court's award of counsel fees 'only on the rarest of occasions, and then only because of a clear abuse of discretion.'" Litton Indus., Inc. v. IMO Indus., Inc, 200 N.J. 372, 386 (2009) (quoting Packard-Bamverger & Co. v. Collier, 167 N.J. 427, 443-44 (2001)). The same standard of review applies to the denial of counsel fees.

New Jersey generally follows the so-called "American Rule" (Rule) which requires that each party pay its own legal costs. Rendine v. Pantzer, 141 N.J. 292, 322 (1995). Plaintiffs and third-party defendants argue that they were entitled to counsel fees premised upon exceptions to the Rule. Plaintiffs argue entitlement premised upon both attorney misconduct and upon fees they incurred as a result of the third-party litigation. Third-party defendants argue entitlement premised upon fees incurred in defending the third–party complaint instituted by RTT.

For the same reasons that the judge held that punitive damages were not warranted, i.e., lack of intentional conduct by Debra pre-closing, the judge denied an award of counsel fees based upon her alleged misconduct. The judge further held that RTT and Debra were essentially "alter egos" and that neither plaintiffs nor third-party defendants incurred any separate or distinct attorney fees predicated upon the third-party action. As such, the exception to the Rule was not applicable as this was not "litigation against a stranger". DiMisa v. Acquaviva, 198 N.J. 549, 554 (2009). We discern no error in either of these determinations.

Finally, we conclude that the remaining arguments raised in these appeals, not specifically addressed herein, lack sufficient merit to warrant discussion in a written opinion. R. 2:11-

3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION